

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY _EB_ D.C.

JAN 1 2 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

---

**FEDERAL TRADE COMMISSION**

    Plaintiff,

      v.

**TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC**, a Florida corporation;

**GOLDEN STATE ADVISORS INSURANCE AGENCY LLC**, a Florida limited liability company;

**TOP HEALTHCARE SOLUTIONS LLC**, a Florida limited liability company;

**DIRECT HEALTH SOLUTIONS INSURANCE AGENCY, LLC**, a Florida limited liability company;

**PRIME HEALTHCARE SOLUTIONS INSURANCE AGENCY LLC**, a Florida limited liability company;

**PREMIER SERVICES GROUP HUB LLC**, a Florida limited liability company;

**ELEVATION MEDIA GROUP LLC**, a Florida limited liability company;

**SARGENT FINANCIAL LLC, d/b/a WEMAKE MEDIA LLC**, a Florida limited liability company;

**RAMZ MEDIA MARKETING LLC**, a Florida limited liability company;

**TIFFANIE GONZALEZ**, individually and as an officer or manager of TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC, PREMIER SERVICES GROUP HUB LLC, and ELEVATION MEDIA GROUP LLC;

Case No. _____

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

**FILED UNDER SEAL**

1

**RAMZEY HASSOUN**, individually and as an officer or manager of TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC, RAMZ MEDIA MARKETING LLC, and WEMAKE MEDIA LLC; and

**RICHARD SARGENT**, individually and as an officer or manager of TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC, GOLDEN STATE ADVISORS INSURANCE AGENCY LLC, and SARGENT FINANCIAL LLC,

    Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, ("TSR"), 16 C.F.R. Part 310. Defendants' violations relate to their deceptive marketing and sale of limited benefit plans and medical discount memberships. For these violations, the FTC seeks relief, including temporary, preliminary, and permanent injunctions, monetary relief, and other relief, including an asset freeze, the appointment of a receiver, and immediate access to Defendants' business premises, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108.

## SUMMARY OF THE CASE

2.    Defendants operate a deceptive telemarketing scheme that takes advantage of consumers looking for comprehensive health insurance. Defendants target consumers who are often shopping for government-sponsored health insurance and visit third-party websites that

mimic the government-sponsored insurance exchanges that offer these options.  Consumers enter their information into these websites, often believing they will be offered comprehensive health insurance that will protect themselves and their families.  In reality, however, such websites sell this personal information, or "leads," to Defendants or their vendors, who then call these consumers.

3.      On their sales calls, Defendants launch into a pitch designed to divert consumers from purchasing the comprehensive health insurance they are seeking.  Defendants mislead consumers into believing that Defendants are selling comprehensive health insurance, or its equivalent, that will provide them substantial coverage for a wide range of medical needs, including consumers' specific priorities such as certain providers, diagnoses, procedures, or medication.  Defendants further misrepresent to consumers that their plans will limit consumers' responsibility for the cost of medical services to a fixed, low amount.  In truth, Defendants sell consumers products that provide far less than comprehensive coverage, leaving consumers exposed to owing thousands of dollars in out-of-pocket medical costs.

4.      Defendants have caused tens of millions of dollars in harm to consumers.  Through this action, the FTC seeks to end Defendants' illegal conduct and secure redress for harmed consumers.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(3), (c)(1)-(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, as amended, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

## DEFENDANTS

### Corporate Defendants

8.     **Defendant Top Healthcare Options Insurance Agency Inc ("THO") is a** Florida corporation with its principal place of business at 401 Fairway Drive, Suite 300, Deerfield Beach, Florida 33441.  THO transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, THO has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

9.     **Defendant Golden State Advisors Insurance Agency LLC ("Golden State** Advisors") is a Florida limited liability company with its principal place of business at 500 Fairway Drive, Suite 102, Deerfield Beach, Florida 33441.  Golden State Advisors transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Golden State Advisors has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

4

10.     **Defendant Top Healthcare Solutions LLC** ("Top Healthcare Solutions") is a Florida limited liability company with its principal place of business at 500 Fairway Drive, Suite 101, Deerfield Beach, Florida 33441.  Top Healthcare Solutions transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Top Healthcare Solutions has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

11.     **Defendant Direct Health Solutions Insurance Agency, LLC** ("Direct Health Solutions") is a Florida limited liability company with its principal place of business at 450 Fairway Drive, Suite 204, Deerfield Beach, Florida 33441.  Direct Health Solutions transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Direct Health Solutions has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

12.     **Defendant Prime Healthcare Solutions Insurance Agency LLC** ("Prime Healthcare Solutions") is a Florida limited liability company with its principal place of business at 450 Fairway Drive, Suite 204, Deerfield Beach, Florida 33441.  Prime Healthcare Solutions transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Prime Healthcare Solutions has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships throughout the United States.

13.     **Defendant Premier Services Group Hub LLC** ("Premier Services Group") is a Florida limited liability company with its principal place of business at 401 Fairway Drive, Suite

300, Deerfield Beach, Florida 33441. Premier Services Group transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Premier Services Group has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

14.     **Defendant Elevation Media Group LLC** ("Elevation Media Group") is a Florida limited liability company with its principal place of business in Cutler Bay, Florida. Elevation Media Group transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Elevation Media Group has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

15.     **Defendant Sargent Financial LLC, also doing business as WeMake Media LLC,** ("Sargent Financial") is a Florida limited liability company with its principal place of business in Boca Raton, Florida. Sargent Financial transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Sargent Financial has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

16.     **Ramz Media Marketing LLC** ("Ramz Media Marketing") is a Florida limited liability company with its principal place of business in Plantation, Florida. Ramz Media Marketing transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Ramz Media Marketing has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

## Individual Defendants

17.     **Defendant Tiffanie Gonzalez** is the founder and President of THO.  Gonzalez is also the manager of Premier Services Group and the CEO of Elevation Media Group, and has directed the formation and growth of the other Corporate Defendants.  At all times relevant to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. For example, Gonzalez has developed sales scripts, contracted with vendors, hired employees and subcontractors, and supported the formation and growth of Corporate Defendants, which have engaged in unlawful acts.  Gonzalez is aware of consumer complaints against Defendants and Defendants' agents.  She is the signatory on several of Defendants' corporate bank accounts, which she uses to pay both business and personal expenses, including purchases of luxury jewelry and designer handbags.  Gonzalez resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

18.     **Defendant Ramzey Hassoun** is a manager and front-end sales trainer of THO and together with Gonzalez, built up THO's operations since its formation. As one of Defendant Gonzalez's business partners, Hassoun directs the business operations of Corporate Defendants. Hassoun is also the CEO of Ramz Media Marketing and a manager of WeMake Media LLC (which is a "d/b/a" of Sargent Financial).  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Hassoun has trained Defendants' sales agents. Hassoun is the signatory on several of Defendants' corporate bank accounts, which he uses to pay both business and personal expenses, including purchases of

7

designer brands, sports game tickets, and luxury vehicles.  Hassoun resides in this District and, in connection with the matters alleged therein, transacts or has transacted business in this District and throughout the United States.

19.      **Defendant Richard Sargent** is THO's Director of Operations.  Sargent, along with Gonzalez and Hassoun, directs business operations for Corporate Defendants.  Sargent is also a manager of Golden State Advisors and the President and Manager of Sargent Financial (doing business as WeMake Media LLC).  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  For example, Sargent manages Defendants' relationships with lead generators and other vendors and set up consumer-facing websites for THO and Premier Services Group.  Sargent is the signatory on several of Defendants' corporate bank accounts, which he uses to pay both business and personal expenses, including purchases of designer brands and for international travel.

## COMMON ENTERPRISE

20.      Defendants THO, Golden State Advisors, Top Healthcare Solutions, Direct Health Solutions, Prime Healthcare Solutions, Premier Services Group, Elevation Media Group, Sargent Financial, and Ramz Media Marketing (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  THO opened the enterprise's first call center in 2019.  In expanding THO's operations, Individual Defendants have formed new corporate entities, installing themselves or their employees as corporate principals.  These entities have operated additional call centers that act as "downline" telemarketing companies under THO, including Defendants Golden State Advisors, Top Healthcare Solutions, Direct Health Solutions, and

8

Prime Healthcare Solutions. In exchange for THO's support, these downlines contribute to the common enterprise by selling the same products using the same misrepresentations and sending commissions on those sales to THO.

21.   Individual Defendants have also formed operational support companies, including Defendants Premier Services Group, Elevation Media Group, Sargent Financial, and Ramz Media Marketing, which handle common functions and expenses, including general compliance, human resource services, payroll, onboarding, licensing, and taxes.

22.   Corporate Defendants have conducted the business practices described below through an interrelated network of companies, which have common ownership, officers, managers, business functions, and commingled assets. Corporate Defendants primarily operate out of the same or neighboring suites in the same or neighboring addresses. Corporate Defendants also share employees and use the same vendors to sell the same or similar products using similar sales tactics. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## COMMERCE

23.   At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

24.   Defendants' telemarketing operation targets consumers who are seeking comprehensive health insurance that will serve as their primary coverage and cover their medical expenses. Using deceptive pitches and high-pressure tactics, Defendants assure consumers that the products they sell are in fact the comprehensive insurance that consumers seek. In reality,

however, Defendants sell consumers products that do not provide comprehensive coverage and leave consumers on the hook for substantial medical costs.

## Background on Health Insurance

25.     Generally, comprehensive health insurance involves an arrangement by an insurance company (or the state or federal government) to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for the consumer's premium payments. To be comprehensive, the coverage must apply to a wide range of medical needs and must include strong limits on potential costs to consumers, which has the effect of transferring most of the consumer's risk to the insurance company.

26.     For example, the Patient Protection and Affordable Care Act ("Affordable Care Act" or "ACA"), also known as "Obamacare," certifies certain comprehensive health insurance plans as ACA-compliant when they provide for certain essential health benefits, including ambulatory patient services, emergency services, hospitalization, pregnancy, maternity and newborn care, mental health and substance abuse disorder services, prescription drugs, rehabilitative and habilitative services and devices, laboratory services, preventive and wellness services, and pediatric services. ACA-compliant plans must also limit costs to consumers. For example, current federal law requires that total patient cost-sharing in ACA-compliant plans be capped at no more than $9,200 annually for individuals in 2025.

27.     A "PPO" plan, also known as a preferred provider organization plan, is a type of health insurance plan that uses a "network" of providers. In a PPO plan, the insurance company negotiates agreements with a group of "in network" hospitals, doctors, pharmacies, and other health care providers, whereby the provider will accept a specific payment rate to treat the PPO

plan's enrollees.  In a PPO plan, patients can choose to see in-network providers and receive full financial protection.

28.     Limited benefit plans and medical discount memberships, by contrast, are not comprehensive health insurance plans.  They are also not PPO plans.  These products, which include fixed indemnity plans, accident and critical illness plans, and membership associations, are typically used to supplement, not replace, a consumer's primary health insurance.  Most significantly, unlike comprehensive health insurance, they do not transfer risk of expensive health care costs away from the consumer by limiting the consumers' exposure to those costs. Instead, they may provide fixed benefits or discounts that are often small in comparison to the total potential liability for health care costs.  For example, fixed indemnity plans provide a fixed payment for specific events, such as $500 for each day an enrollee is hospitalized, leaving the enrollee liable for the remaining balance of the bill.  Comprehensive health insurance, by contrast, assumes responsibility to pay all but a specified amount of the actual cost of the medical services the patient receives, such as paying all of a patient's hospital bill—whether it is $10,000 or $100,000 – less the specified fixed amount.

**Defendants Target Consumers Searching for Comprehensive Health Insurance**

29.     Defendants call consumers based on leads from third-party lead generators that collect detailed personal information from consumers who are often searching for options provided through a state-sponsored health insurance exchange, or the federal marketplace at HealthCare.gov.  These exchanges allow individuals or families to enroll in comprehensive health insurance.  HealthCare.gov, for instance, offers only ACA-compliant plans.  Consumers shopping online on these government-sponsored exchanges are likely aware that ACA-compliant plans fundamentally shift risk and cap medical liability.  Consumers who search online for such

insurance find, among search results, advertisements for websites that promise access to ACA-compliant plans. *See* **Image A** below capturing an August 27, 2024 Google search for "obamacare" resulting in a sponsored website called "obamacare-plans.com."



**Image A**

30.     This search engine advertisement claimed to offer health insurance through references to "Affordable Care Act Plans," "Obamacare Health Insurance Carriers," and "2024 Obama Care Plans." It reinforced these claims by noting, "Open Enrollment is on Now," invoking the limited time period during which consumers may purchase insurance without a "qualifying life event," such as losing existing coverage or moving. The pop-up on the results advertised a "Silver Plan" and a "Gold Plan," which are categories of plans offered through the ACA marketplace.

31.     Defendants paid hundreds of thousands of dollars to purchase leads from this website and called hundreds of consumers who visited this website.

32.     Consumers who click on ads such as this are led to lead generation websites that mimic or imply affiliation with HealthCare.gov or state-administered exchanges. For example,

12

from just one lead generator, Defendants have purchased at least tens of thousands of leads

generated by websites such as "Obamacare-Health-Plans.com," "KentuckyHealthPlans.org,"

"ConnecticutHealthPlans.org," "ObamaCare-Plans.com," and "ColoradoHealthInsurance.org."

Under the guise of tailoring quotes for consumers for ACA plans or determining whether they

"qualify" for these plans, these sites manipulate consumers into revealing increasingly detailed

personal information.  As a result of these tactics, consumers often believe that they are applying

for or will receive information about comprehensive health insurance plans, including ACA-

compliant plans.

### Defendants' Deceptive Telemarketing Calls Include False Promises of Low-Cost, Comprehensive Health Insurance

33.     The information that consumers enter on these deceptive websites becomes a

valuable "lead" that Defendants acquire from lead generators. Defendants then call consumers,

either directly or through the lead generators, who transfer the calls to Defendants.  Once

Defendants' sales agents connect with a consumer, they often try to establish legitimacy by

identifying themselves as an insurance agent that is licensed in the consumer's state.  Having just

submitted their contact information on what they often believed to be HealthCare.gov, or their

home state's insurance exchange, consumers often believe they are speaking with a licensed

agent who is affiliated with the federal or state government, or otherwise authorized to sell health

insurance affiliated with the federal or state government.  Consumers are often unaware that they

have been diverted and submitted their personal information to a lead generation website instead.

Typically, when consumers speak to Defendants' agents, these consumers are seeking, and

believe Defendants' agents are selling, ACA-compliant comprehensive health insurance or its

equivalent.

34.     In calls with Defendants' agents, consumers often ask for health insurance coverage that protects their entire family and pays for doctors' visits and emergency room visits or covers specific needs such as specific providers or specialists, upcoming medical procedures, diagnoses, or prescriptions for certain medications.

35.     In response, Defendants' agents pitch consumers on medical plans, which they describe as "insurance" and claim will meet consumers' specific needs, such as specific providers, types of medical services, or medications.  These plans often require a one-time enrollment fee followed by recurring monthly charges, which Defendants' agents frequently describe as "premiums."  Defendants' agents often describe these plans as PPOs and represent that consumers will be able to use their own doctors or a large network of "in-network" providers across the country.

36.     Defendants also entice consumers by representing that their plans have limited costs. In particular, Defendants' agents often falsely claim that the products have no "deductibles" and nominal "copays," leading consumers to believe that their portion of responsibility for medical costs will be low.

37.     In making these deceptive pitches, Defendants also conceal from consumers material information that would make clear to consumers the limited benefits they will receive from the products and the substantial risk they will continue to bear.  For example, Defendants' agents do not disclose that the products that they are selling at best provide small payments or discounts even for very costly medical services, and include various limitations such as per-day, per incident, annual, or lifetime.  Nor do they disclose that the plans do not limit consumers' potential share of medical costs, such as true copays, true deductibles, or maximum out-of-pocket provisions.

38.     Based on Defendants' claims, consumers purchase what they often believe to be comprehensive, low-cost health insurance with specific benefits, only to later learn the limitations of their coverage.  For example, one consumer told one of Defendants' agents that she was looking for primary health insurance because she was recently unemployed and no longer had job-sponsored health insurance.  She explained that she needed coverage for primary care doctor visits and emergency room ("ER") visits.  Defendants' agent offered the consumer what he called a "PPO" plan, and claimed she could go to any doctor that was "in network."  After purchasing the plan, the consumer went to a primary care physician who was supposedly "in network," only to be told that her plan was not health insurance and would not cover the visit.  Later, the consumer went to an ER because of an allergic reaction and was billed $5,417 because the plan denied coverage.  Defendants had actually sold her a fixed indemnity plan bundled with an accident plan and membership association, which at most would have covered $50 for her ER visit.  Defendants' sales agent did not disclose the true nature of the plan or these limitations.

39.     In promoting their products, Defendants' agents on occasion discourage consumers from enrolling in comprehensive health insurance sold on online health exchanges.  For example, Defendants' agents claim that these plans are too expensive, the deductibles are too high, or consumers will not qualify.  Defendants instead direct consumers to the products they are commissioned to sell.

40.     For example, one of Defendants' agents told a consumer that a plan through a state exchange would cost about $300-$400 per month with a $7,000 to $8,000 deductible.  The agent convinced the consumer to purchase a "cheaper" "Multiplan PPO" instead.  In reality, the agent sold the consumer a package that included enrollment in a fixed indemnity plan and a membership association.  The indemnity plan would have provided very limited benefits; for

example, it would have provided a $500 benefit for inpatient surgery and a $200-per-day benefit for an emergency room visit with a maximum of two days.  Defendants' sales agent did not disclose these limitations to the consumer.

41.     Similarly, the same agent, claiming to be with the "enrollment center" for an official state insurance exchange, told another consumer from the outset he would not qualify for Medicaid.  The agent convinced the consumer to instead sign up for a package that turned out to be primarily a fixed indemnity plan, which he did not disclose to the consumer.  The consumer later learned elsewhere that the determination for qualifying for Medicaid in his state actually involves an application process that typically takes several months.

42.     Defendants' agents employ aggressive tactics to override consumers' concerns and objections. Defendants pressure consumers to enroll quickly, for example, by claiming to consumers who express hesitancy or ask for more time that they cannot guarantee the quoted discounted price if the consumer does not enroll that same day.  The agents also often assure customers that they can cancel their plan anytime.

43.     Defendants do not provide plan documentation to consumers prior to their purchase of the products. If a consumer asks to review documentation prior to purchase, Defendants' agents assure the consumer they will receive confirmation emails with access to member portals and documentations after enrollment.

44.     Once consumers express interest in purchasing Defendants' products, Defendants' agents arrange for payment by asking for the consumers' debit or credit card information.  Only after collecting consumers' payment information do Defendants guide consumers through a purported "verification" process, conducted either by the sales agent or a separate verification agent to whom the consumer is transferred.  During verification, consumers are asked to confirm

a series of complex, lengthy statements. Defendants caution consumers not to ask any questions during verification and tell them that the verification recording must be uninterrupted or consumers will need to start the entire process over again. For these reasons, consumers feel pressured to agree with all of the verification statements to complete the sale.

45.     During this process, Defendants' agents provide a link that consumers use to execute an electronic agreement on a mobile device. Often Defendants' agents pressure consumers to scroll through the electronic agreement quickly, and sign or check boxes without an opportunity to read the text of the document.

46.     Even the information Defendants provide in this "verification" process is false, misleading, or incomplete. For example, Defendants may tell consumers that the health plans they are purchasing are not major medical health insurance, but only because major medical health insurance must have a deductible and must cover things like pregnancy, substance abuse, and long-term inpatient psychiatric services. However, as alleged above, the plans Defendants sell are not comprehensive health insurance for many additional reasons including that, fundamentally, such plans do not transfer risk from the consumer to an insurer. Thus, even Defendants' "verification" process often leads the consumer to believe they are purchasing comprehensive health insurance or its equivalent.

47.     Many of Defendants' deceptive sales tactics are evident in a recorded undercover transaction conducted by Plaintiff. In this transaction, an FTC investigator stated to THO's agents clearly that he wanted to purchase health insurance as an alternative to health insurance offered through the Veterans' Administration, so he could have coverage for events such as doctors' appointments and urgent care visits. A THO agent specifically discouraged him from enrolling in another marketplace plan, claiming the deductible would be too high. Instead,

17

THO's agent directed the investigator to a "no-deductible PPO" plan that would provide coverage "nationwide" and cover events such as doctors' visits, prescriptions, surgeries, and hospitalizations. In reality, the "no-deductible PPO" plan was actually a fixed indemnity plan. Later in the conversation, the agent characterized the fixed indemnity plan as "regular insurance" and confirmed that if the investigator was injured, for example, or needed hospitalization or surgery, the plan would provide coverage for these events. As discussed below, the fixed indemnity plan actually sold by THO's agent did not provide any of the promised benefits.

**The Products Defendants Sell Are Not Comprehensive Health Insurance**

48.     As alleged above, Defendants typically sell consumers a bundle of products that include fixed indemnity plans, accident and critical illness plans, and membership associations. These products, even when considered together, are not comprehensive health insurance, and do not provide consumers with the benefits promised by Defendants.

49.     In fact, there is a vast difference between what Defendants promise and what consumers receive. For example, in the undercover transaction alleged above, Defendants sold the FTC investigator a fixed indemnity plan instead of the promised comprehensive health insurance. Defendants' agent also mischaracterized the product as a PPO plan that would provide coverage nationwide when, in reality, a fixed indemnity plan is not a PPO health insurance plan.

50.     During the investigator's sales call, Defendants' agent further misrepresented specific benefits offered by the plan the agent was selling. For example, the agent promised that the investigator would have specific copays for specific healthcare events: $10 to see a doctor or specialist, and $25 for an urgent care visit. The agent also assured the investigator that this plan would cover a doctor's visit to a specific "in network" physician identified by the investigator.

18

51.     In fact, even if the physician's office accepted this fixed indemnity plan, the plan could pay only up to $75 for a visit.  Thus, Defendants' agent misrepresented that the investigator would only have to pay a $10 copay to see a specific physician when, in reality, the investigator would have to pay the entire cost of a visit, minus a potential $75 discount. Meanwhile, in 2021, the average out-of-pocket cost for a physician visit was more than $360.

52.     Similarly, despite being told that his plan would cover surgeries and hospitalizations, the plan Defendants sold the investigator offered only certain fixed payments, $250 per day he was hospitalized, for a maximum of 10 days, $500 for an inpatient surgery, and $250 for an outpatient surgery.  Again, any remaining balance owed for the costs of these events would be the investigator's responsibility.  This coverage pales in comparison to the average cost per day of hospitalization which, for example, was on average $6,500 from 2015-2017 among those with private health insurance managing chronic conditions. The representative never disclosed the limitations of the plan to the investigator.

53.     In other instances, one fixed indemnity plan sold by Defendants to a consumer paid only $50 toward physician visits, capped at five visits per year, and a maximum of $50 per day for emergency room visits, capped at one visit per year.  Another fixed indemnity plan sold by Defendants to a consumer provided only $200 per day of hospitalization and no surgery benefits at all.  These are all amounts that are far below the actual cost of a major health care event.

54.     As for the membership associations sold by Defendants, these at best merely provide consumers with access to various discounts from third parties, only some of which relate to healthcare.  In addition to discounts on prescription medications, for example, some of these "lifestyle" and "wellness" benefits include discounts for: UPS shipping services, vitamins,

19

roadside assistance, pet insurance, and spa and wellness gift cards.  Further, despite being told by Defendants' agents that their prescriptions would be covered under the plans sold by Defendants, consumers are on occasion forced to pay for urgent prescriptions out of pocket.

**Defendants' Practices Have Caused Substantial Consumer Harm**

55.     Defendants' customers rely on Defendants' representations and purchase these plans under the mistaken belief that they will provide the financial benefits of comprehensive health insurance.  These consumers pay enrollment fees often ranging from $50 to $150, as well as substantial recurring monthly fees to participate in these plans, at times $500 per month or more.

56.     Many consumers do not realize that the plans they have purchased do not provide comprehensive health insurance until they attempt to use the plans to cover health services for the first time and are unable to do so.  For example, some consumers present the plan to their doctor's office, only to be told that the plans do not provide health insurance and the office cannot accept the consumer's plan as health insurance.

57.     Other consumers who have purchased Defendants' plans later experience medical emergencies that require them or their loved ones to visit the ER.  These consumers then learn, only during or after the emergency, that Defendants' plans leave the consumers bearing the overwhelming majority of the cost of emergency care. These consumers have incurred thousands of dollars in urgent or necessary medical expenses that they are forced to cover out-of-pocket after the plans provide no coverage or only a minimal payment or discount.

58.     For example, as alleged above, one consumer specifically told Defendants' agent that she needed a primary health insurance plan that would cover ER visits only to find that, when she visited the ER, she incurred over $5,000 in unexpected medical costs thanks to the plan

Defendants sold her.  Another consumer attempted to use Defendants' products to seek treatment for both her own shoulder injury and her son's broken arm.  After receiving an unexpected $50 check in the mail from the fixed indemnity plan and a small discount off her ER visit, the consumer ended up owing over $8,000 in unexpected medical bills for the treatment of her family's injuries.  A third consumer specifically asked a Direct Health Solutions agent for a health insurance plan that would cover his $27,000-per-month, life-sustaining medication.  Instead, the agent sold the consumer a fixed indemnity plan and membership association that provided no coverage when he later tried to refill his medication.

59.     Defendants are aware of consumers' complaints about their practices and the products they sell.  During their sales calls, Defendants' agents often leave consumers with a "direct" phone number for the individual agent.  In numerous instances, consumers call that number, only to be routed to a general customer service representative who will not transfer the consumer to their sales agent.  Further, although Defendants' agents often tell consumers they can cancel their plan anytime, when consumers attempt to contact Defendants or the third-party plan administrators to cancel their plans and seek refunds, they often experience great difficulty.  Some consumers experience long hold times and multiple transfers or are unable to connect with anyone at all.  Others encounter uncooperative or even argumentative representatives who refuse to cancel their plan.  In numerous instances, consumers are forced to cancel or freeze their credit cards or file complaints in order to cancel their plans and obtain refunds.

60.     Since 2020, Defendants have caused tens of millions of dollars in harm to consumers.

**Defendants' Conduct is Ongoing**

61.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

**VIOLATIONS OF THE FTC ACT**

62.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

63.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I – Misrepresentations in Violation of the FTC Act**

64.     In numerous instances, in connection with the advertising, marketing, promotion, or sale of limited benefit plans and medical discount memberships, Defendants have represented, directly, or indirectly, expressly or by implication, that the limited benefit plans and medical discount memberships sold by Defendants:

> A.  are comprehensive health insurance, or the equivalent of such insurance;
>
> B.  are Preferred Provider Organization ("PPO") plans;
>
> C.  provide substantial coverage for consumers' specific needs, such as specific providers, specific types of medical services, or specific prescription medications; and
>
> D.  limit consumers' responsibility for the cost of certain medical services to a fixed, low amount, such as through copays or deductibles.

65.     Defendants' representations as described in Paragraph 62 are false or misleading.

64.     Therefore, Defendants' representations as described in Paragraph 62 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

65.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and

deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-

6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended

certain provisions thereafter.

66.     Defendants are "seller[s]" or "telemarketer[s]" engaging in "telemarketing" as

defined by the TSR, 16 C.F.R. § 310.2(ee), (hh), (ii). A "seller" means any person who, in

connection with a telemarketing transaction, provides, offers to provide, or arranges for others to

provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(ee). A

"telemarketer" means any person who, in connection with telemarketing, initiates or receives

telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(hh). "Telemarketing" means a

plan, program, or campaign which is conducted to induce the purchase of goods or services or a

charitable contribution, by use of one or more telephones and which involves more than one

interstate telephone call. 16 C.F.R. § 310.2(ii).

67.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by

implication, in the sale of goods or services, any material aspect of the performance, efficacy,

nature, or central characteristics of the goods or services that are the subject of a sales offer. 16

C.F.R. § 310.3(a)(2)(iii).  Likewise, the TSR prohibits sellers and telemarketers from making any

false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. §

310.3(a)(4).

68.     The TSR also prohibits sellers and telemarketers from failing to disclose

truthfully, in a clear and conspicuous manner, before a consumer consents to pay, all material

restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(ii).

69.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 16 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II – Misrepresentations in Telemarketing Calls in Violation of the TSR**

70.     In numerous instances, in connection with the telemarketing of limited benefit plans and medical discount memberships, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the limited benefit plans and medical discount memberships, including, but not limited to, that the limited benefit plans and medical discount memberships sold by Defendants:

      A.   are comprehensive health insurance, or the equivalent of such insurance;

      B.  are Preferred Provider Organization ("PPO") plans;

      C.  provide substantial coverage for consumers' specific needs, such as specific providers, specific types of medical services, or specific prescription medications; and

      D.  limit consumers' responsibility for the cost of certain medical services to a fixed, low amount, such as through copays or deductibles.

71.     Therefore, Defendants' acts or practices as described in Paragraph 70 violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii) & (a)(4), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III – Failure to Disclose Material Information in Telemarketing Calls, In
Violation of the TSR**

72.     In numerous instances, in connection with the advertising, marketing, promotion,
or sale of limited benefit plans and medical discount memberships, before consumers consent to
pay for the products, Defendants have failed to disclose truthfully, in a clear and conspicuous
manner, material restrictions, limitations, or conditions to purchase, receive, or use the products
that were the subject of the sales offer, including that such products:

> A.  were not comprehensive health insurance, or the equivalent of such insurance;
>
> B.  contained severely restrictive limits on monetary benefits provided for
>     medical services, including but not limited to, per day, per incident, annual,
>     and lifetime limits on monetary benefits; and
>
> C.  did not have out-of-pocket maximums for many of the costliest medical
>     services due to monetary limits on plan benefits.

73.     Therefore, Defendants' acts or practices as described in Paragraph 72 violate the
TSR, 16 C.F.R. §§ 310.3(a)(1)(ii), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## <u>CONSUMER INJURY</u>

74.     Consumers are suffering, have suffered, and will continue to suffer substantial
injury as a result of Defendants' violations of the FTC Act and the TSR.  Absent injunctive relief
by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## **PRAYER FOR RELIEF**

75.     Wherefore, the FTC requests that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act and the TSR;

B.  Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, and the appointment of a receiver;

C.  Award such money and other relief within the Court's power to grant, including, but not limited to, the rescission or reformation of contracts, the refund of money, or other relief necessary to redress injury to consumers; and

D.  Award any additional relief as the Court determines to be just and proper.

Dated: January 12, 2026

Respectfully submitted,

Tammy Chung (Special Bar No. A5503438)
Jason C. Moon (Special Bar No. A5502384)
Nicole G. H. Conte (Special Bar No. A5503436)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9399; tchung@ftc.gov (Chung)
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9396; nconte@ftc.gov (Conte)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION