FILED BY _____ D.C.

JAN 12 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>    Plaintiff,<br><br>        v.<br><br>**TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC, et al.,**<br><br>    Defendants. | Case No. _____<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>**<u>FILED UNDER SEAL</u>** |

1

### TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   DEFENDANTS' UNLAWFUL TELEMARKETING SCHEME ....................................... 3

      A.    Defendants Target Consumers Searching Online for Comprehensive Health
            Insurance Plans. .............................................................................. 3

      B.    Defendants Misrepresent that Their Plans Will Substantially Cover Consumers'
            Needs and Protect Them from High Medical Costs. ............................... 7

            1.    Defendants Misrepresent that Their Proposed Plans are Comprehensive
                  Health Insurance or Its Equivalent. ......................................... 7

            2.    Defendants Mischaracterize Their Proposed Plans as PPO Plans. ........... 12

            3.    Defendants Misrepresent That Their Proposed Plans Will Provide
                  Substantial Coverage for Consumers' Medical Needs and Limit their
                  Liability, Failing to Disclose That the Plans Do Not Cap Liability .......... 13

      C.    Defendants Force Sales with Deceptive Disclosures and Heavy-Handed Sales
            Tactics ......................................................................................... 17

      D.    Defendants Harm Consumers and Expose Them to Severe Injury ................ 19

II.   DEFENDANTS ........................................................................................ 21

      A.    Individual Defendants ........................................................................ 21

      B.    THO.... ......................................................................................... 25

      C.    Downline Corporate Defendants .......................................................... 26

      D.    Operational Support Defendants .......................................................... 27

      E.    Common Enterprise ......................................................................... 29

III.  ARGUMENT ........................................................................................... 31

      A.    This Court Has the Authority to Grant the Requested Relief. .................... 31

      B.    The FTC Meets the Standard for Preliminary Injunctive Relief .................. 33

            1.    The FTC Is Likely to Succeed on the Merits. ............................... 33

2.     The Equities Weigh in Favor of Granting Injunctive Relief.................... 42

C.     The Scope of the Proposed *Ex Parte* TRO is Necessary and Appropriate. .......... 43

3.     Conduct Relief................................................................................... 44

4.     Asset Preservation Is Necessary to Preserve the Possibility of Final Relief. ................................................................................................ 44

5.     A Receiver Is Necessary to Halt the Injury and Locate and Preserve Business Assets and Records. ................................................................ 46

6.     Immediate Access and Limited Expedited Relief Are Appropriate. ........ 47

7.     The TRO Should Be Issued Without Notice to Defendants to Preserve the Court's Ability to Fashion Meaningful Relief. ......................................... 48

IV.    CONCLUSION................................................................................................. 48

# TABLE OF AUTHORITIES

## Cases

*Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)..............................................34

*AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004).....................48

*FTC v. Cyberspace.com LLC*, 453 F.2d 1196, 1200 (9th Cir. 2006)............................................35

*FTC v. 1st Guar. Mortg.*, No. 09-cv-61840, 2011 WL 1233207 (S.D. Fla. March 30, 2011) ..... 39

*FTC v. AMG Capital Mgmt., LLC*, 593 U.S. 67 (2021)..................................................................32

*FTC v. Consumer Collection Corp.*, No. 14-cv-62491,
2015 WL 12533013 (S.D. Fla. Sept. 9, 2015) ........................................................................ 39, 40

*FTC v. Digit. Income Sys., Inc.*, No 20-24721-CV-UNGARO,
2020 WL 7481548, (S.D. Fla. Dec. 1, 2020).................................................................................43

*FTC v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800 at *1 (S.D. Fla. Feb. 28, 2018) ..............42

*FTC v. Elegant Sols., Inc.*, 2022 WL 2072735, at *2 (9th Cir. 2022) ...........................................40

*FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)...............................................39, 44

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014) ..................................33, 39

*FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017) ..............................................38

*FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246 (M.D. Fla. 2018)....39, 40

*FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) .............................................................42

*FTC v. Noland*, 2021 WL 6426079 (9th Cir. Dec. 14, 2021) .......................................................32

*FTC v. Noland*, No. CV-20-00047-PHX-DWL,
2021 WL 4127292 (D. Ariz. Sept. 9, 2021)...............................................................32, 40, 41

*FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021)...................31, 34, 39

*FTC v. Partners In Health Care Assoc., Inc.*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) ..........39, 40

*FTC v. People Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) .................................34

*FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) .........................35

*FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019).... 34, 35, 42, 43, 44, 46

*FTC v. Simple Health Plans, LLC*, 58 F.4th 1322 (11th Cir. 2023) ................................. 32, 44, 46

*FTC v. Start Connecting, LLC*, No. 8:24-cv-1626-KKM-AAS,
2024 WL 3990084, at *2 (M.D. Fla. Jul. 11, 2024)................................................................. 32, 48

*FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)................................................................. 34

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007).................... 35, 40

*FTC v. U.S. Mortg. Funding, Inc.*, No. 11-CV-80155,
2011 WL 810790, at *2 (S.D. Fla. Mar. 1, 2011).............................................................................. 33

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991) ............................... 33, 34, 43

*FTC v. USA Beverages, Inc.*, No. 05-61682-CIV,
2005 WL 5654219 at *8 (S.D. Fla. Dec. 6, 2005) ......................................................................... 43

*FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940, at *7 (S.D. Fla. Jan. 31, 1996) .................... 39

*FTC v. World Patent Mktg.*, No.17-cv-20848-GAYLES,
2017 WL 3508639, at *17 (S.D. Fla. Aug. 16, 2017)................................................................. 44, 46

*FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 347 (9th Cir. 1989) ............................. 34, 42, 43

*FTC v. WV Universal Mgmt., LLC*, 866 F.3d 1234, 1239 (11th Cir. 2017) .......................... 31, 38

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, F.3d 982, 985 (11th Cir. 1995) ...................... 34

*SEC v. First Fin. Grp. Of Texas.*, 645 F.2d 429, 438 (5th Cir. 1981) ......................................... 46

*SEC v. MCC International Corp.*, No. 2:22-cv-14129-KMM, 2022 WL 2341216, at *6 (S.D. Fla.
Apr. 26, 2022) ................................................................................................................................. 48

**Statutes**

15 U.S.C. § 45(a) ............................................................................................................... 2, 34, 37

15 U.S.C. § 53(b).................................................................................................................... 31, 40

16 U.S.C. § 57a(d)(3)...................................................................................................................... 37

15 U.S.C. § 57b.................................................................................................................... 31, 40

15 U.S.C. § 6102(c) ........................................................................................................ 32, 37

15 U.S.C. §§ 6101-6108 ........................................................................................................ 2

## Rules

16 C.F.R. § 310 .................................................................................................... 2, 31, 37

16 CFR § 310.3(a) ..................................................................................................... 37, 38

FED. R. CIV. P. 26(d)(1), 30(a)(2), 33(a), & 34(b) ........................................................... 48

FED. R. CIV. P. 65(b)(1)(A) ........................................................................................ 48

## I.   INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), brings this action to halt a predatory telemarketing scheme that has scammed millions of dollars from consumers who are searching for comprehensive health insurance plans that limit out-of-pocket medical costs. In reality, Defendants sell products that offer, at most, limited discounts that leave the consumer paying hundreds of dollars in monthly "premiums" for a non-health insurance product that fails to protect them from unexpected medical liability. Consumers learn this only after purchase, sometimes only after finding that they owe astronomical bills for standard medical care that Defendants told them would be covered. In some cases, victims have found themselves unable to afford life-sustaining medicine. Meanwhile, the individual perpetrators of this scheme earn millions in profits, which they use to purchase expensive jewelry, luxury goods from designer brands like Louis Vuitton, European vacations to Paris and Rome, weekend jaunts in Las Vegas, and tickets to live sporting events.

To carry out their bait-and-switch scheme, Defendants purchase from "lead generator" companies contact information of consumers searching online for health insurance. These lead generators manipulate consumers into providing their information on websites that mimic government-sponsored health insurance exchanges, leading consumers to expect calls from agents selling comprehensive health insurance. Instead, Defendants' agents call consumers and employ scripted, high-pressure sales pitches to convince them to buy what Defendants characterize as comprehensive health insurance plans, such as Preferred Provider Organization

("PPO plans"), that will provide substantial coverage for their needs and protect them from high medical costs.

In reality, Defendants enroll consumers in products that are not health insurance at all, let alone comprehensive health insurance or PPO plans. Unlike comprehensive health insurance, these products do not shift the consumer's risk of incurring medical costs to an insurer by capping consumers' liability for medical costs. Despite these plans' shortcomings, consumers still pay hundreds of dollars in enrollment fees and recurring monthly "premiums," believing they have enrolled in health insurance. Many consumers learn that they have been defrauded only after they have incurred thousands of dollars in unexpected medical expenses. One consumer lost the ability to pay for an expensive life-sustaining medication that Defendants promised would be covered.

Defendants' telemarketing scheme is illegal, violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310. To put an immediate stop to Defendants' fraudulent scheme, the FTC seeks a non-noticed, *ex parte* temporary restraining order ("TRO") enjoining Defendants' illegal practices and preserving the Court's ability to order effective final relief by freezing their assets. Defendants' illegal practices are documented by sworn written testimony from thirteen harmed consumers, an insurance expert's analysis of Defendants' products, the significant financial consumer harm Defendants have caused, and substantial evidence of Defendants' dissipation of their assets. As long as Defendants are permitted to operate, consumers will be in harm's way. This Court should put an end to Defendants' illegal practices.

## II.     DEFENDANTS' UNLAWFUL TELEMARKETING SCHEME

Defendants carry out their scheme by contacting consumers who have indicated an interest in purchasing health insurance and then using deceptive tactics to sell them non-health insurance products. Defendants pay lead generators to gain access to consumers who search the web for comprehensive health insurance plans. Defendants intercept these consumers and use aggressive sales tactics to mischaracterize their proposed health plans as comprehensive health insurance. In doing so, Defendants use health insurance-related terms like "PPO," "copay," and "deductible," and promise consumers substantial medical coverage, leading consumers to believe that they are purchasing health insurance that will cap their potential out-of-pocket medical costs. Instead, Defendants enroll consumers in products that do not cap consumers' liability and do not provide comprehensive coverage at all. Consumers discover the gravity of Defendants' deception only after paying expensive enrollment fees and recurring monthly "premiums." Defendants first harm consumers by duping them into paying hundreds of dollars for products that will only provide, at best, limited discounts for certain services. Defendants then put consumers at risk for even greater harm by leaving them uninsured and liable for substantial, potentially unlimited medical costs.

### A.     Defendants Target Consumers Searching Online for Comprehensive Health Insurance Plans.

Defendants prey on consumers searching for health insurance. Often, these consumers start by conducting Internet searches for the federal Health Insurance Marketplace at Healthcare.gov or the online exchanges offered by their state.[1] These official insurance platforms

---

[1] Declaration of Stefany Horn ("Horn Dec.") at ¶2 (App. 83); Declaration of Michael Huff ("Huff Dec.") at ¶2 (App. 150); Declaration of Gunnar Lagerberg ("Lagerberg Dec.") at ¶2 (App.

offer comprehensive health insurance: plans that provide a comprehensive array of health care services and limit maximum out-of-pocket liability.[2] However, lead generators often pay for sponsored search results that may appear more prominently than those of the official insurance platforms. In so doing, these lead generators divert consumers to their websites, which mimic or imply affiliation with government-sponsored exchanges for the purposes of extracting and selling consumer information as "leads" to telemarketers like Defendants.

For example, a 2024 Google search for "obamacare," as displayed below, produced a sponsored advertisement for ObamaCare-Plans.com, one of Defendants' top lead sources.[3] The advertisement claims to offer "2024 Affordable Care Act Plans," and states that "Open Enrollment is On Now," and that consumers can "See Your 2024 Coverage Options" and "Get Obamacare Today."

**Image A – Obamacare-Plans.com Google Ad Capture (August 27, 2024) (excerpt)** [4]

---

156); Declaration of Elsa Lee ("Lee Dec.") at ¶2 (App. 296); Declaration of Ethan Lutz ("Lutz Dec.") at ¶2 (App. 328); Declaration of Dru Musselman ("Musselman Dec.") at ¶2 (App. 378); Declaration of Ajit Singh ("Singh Dec.") at ¶2 (App. 403).

[2] Declaration of Christen Linke Young ("Expert Dec.") at pg. 3 (App. 582); *see also* Declaration of FTC Investigator Brent McPeek ("McPeek Dec.") at Attach. C (App. 968-970).

[3] Defendants conducted sales calls with hundreds of consumers who accessed ObamaCare-Plans.com. *See* Declaration of FTC Investigator Douglas McKenney ("McKenney Dec.") at ¶26 and Attach. M (App. 629, 663).

[4] McKenney Dec. at ¶10 and Attach. A (App. 624, 633-1).

4

Consumers who accessed this website would have encountered the below web page, which would purportedly allow them to "compare Affordable Health Options in New York!"



**Image B – Obamacare-Plans.com Website Capture (August 27, 2024) (excerpt)**[5]

This webpage also included detailed descriptions of the Affordable Care Act, and "Open Enrollment," invoking the limited time period during which consumers may purchase ACA-compliant insurance without a "qualifying life event," such as losing existing coverage or moving.[6] Consumers who entered a zip code and clicked on the "Start Now" button would then see a webpage advertising access to quotes for "Blue Cross of NY, UnitedHealth, & Aetna" and "2024 New York Obamacare Plans from $0/mo."[7]

Between 2019 and 2024, Defendants paid at least $1.9 million to MediaAlpha, Inc. ("MediaAlpha") for hundreds of thousands of leads generated from this ObamaCare-Plans.com website, and other similar websites such as ObamaCarePlans.com, HealthPlans.com,

---

[5] *Id.* at ¶11 and Attach. B (App. 624, 634).
[6] *Id.* at ¶11 and Attach. B (App. 624, 634).
[7] *Id.* at ¶12 and Attach. C (App. 625, 636-637).

KentuckyHealthplans.org, ColoradoHealthInsurance.org, and AffordableCareCalifornia.org.[8] The FTC recently sued MediaAlpha, alleging that the company misled consumers with promises of comprehensive health insurance only to sell their information to telemarketers like Defendants here who typically did not offer comprehensive health insurance.[9] MediaAlpha is only one of many lead generators that Defendants pay to obtain leads.[10]

Consumers who enter their information on these websites expect to receive information about comprehensive health insurance options.[11] Instead, Defendants, through their vendors,[12] contact these consumers and sell them something far different: a bundle of limited benefit plans and other products that are far from comprehensive health insurance. For instance, one consumer, Elsa Lee, who submitted her information on the website discussed above, "ObamaCare-plans.com," reported receiving a call shortly thereafter from one of Defendants' agents.[13]

---

[8] *See id.* at ¶26 and Attach. M (App. 629, 663). For screenshots of KentuckyHealthplans.org and ColoradoHealthInsurance.org, see *id.* at Attachs. E-F and H-J (App. 641-645, 651-658).

[9] *See generally* Complaint at ¶18-77, *FTC v. MediaAlpha, Inc.*, No. 2:25-cv-07263 (C.D. Ca. Aug. 6, 2025), Dkt. No. 1. In August 2025, MediaAlpha agreed to an injunction and $45 million judgment to settle the allegations. *See generally id.* at Dkt. No. 17 (order for permanent injunction).

[10] Since 2019, Defendants have paid millions of dollars to at least nineteen different lead generators. In the month of December 2022 alone, THO paid over $405,000 to lead generators, including MediaAlpha. *See* McPeek Dec. at ¶60 (App. 698).

[11] *See, e.g.*, Musselman Dec. at ¶¶2-3 (App. 378-379); Lutz Dec. at ¶2 (App. 328); Huff Dec. at ¶2 (App. 150); Horn Dec. at ¶2 (App. 83); Declaration of Christina Aalto ("Aalto Dec.") at ¶3 (App. 1); Lagerberg Dec. at ¶2 (App. 156).

[12] In addition to selling consumer data to Defendants, MediaAlpha transferred thousands of live calls to Defendants. *See* McKenney Dec. at ¶26 (discussing data lead sales versus "qualified calls") and Attach. M (App. 629, 663).

[13] Lee Dec. at ¶¶2-3 (App. 296). Ms. Lee had searched on Google for Minnesota's health insurance exchange, MNSure, and the "Affordable Care Act" before ending up on ObamaCare-Plans.com in August 2024. The agent sold Ms. Lee non-health insurance products. *See* Expert Dec. at pgs. 6, 10, 12 (App. 585, 589, 591). The FTC retained Christen Linke Young, an expert

### B.   Defendants Misrepresent that Their Plans Will Substantially Cover Consumers' Needs and Protect Them from High Medical Costs.

Defendants call consumers who are seeking comprehensive health insurance and pitch them plans that, Defendants assure consumers, will cover their needs and provide them with strong protection. In reality, Defendants sell consumers something else entirely: limited benefit plans and medical discount memberships. After connecting with consumers who had searched online for government-sponsored health insurance, Defendants keep up the ruse that they are selling comprehensive health insurance plans that can serve as consumers' primary health insurance. Moreover, to further the deception, Defendants use health insurance-related terms to mischaracterize their plans as PPO plans and misrepresent their severely limited scope of coverage. Defendants also fail to disclose that their plans do not cap consumers' liability for medical expenses, causing consumers to pay hefty enrollment fees and monthly "premiums" for products that leave them uninsured and at risk of incurring unlimited medical costs.

#### 1.   Defendants Misrepresent that Their Proposed Plans are Comprehensive Health Insurance or Its Equivalent.

From the beginning of their sales calls, Defendants' agents reinforce for consumers that Defendants are offering comprehensive health insurance. Defendants' agents typically start by establishing their legitimacy, often introducing themselves as insurance agents licensed to sell health insurance.[14] Having just submitted an online inquiry for health insurance, consumers

---

in the field of health insurance, to summarize what makes health insurance "comprehensive," review products that the FTC investigator and consumers had purchased from Defendants, and provide an opinion about whether the products Defendants sell are comprehensive health insurance.

[14] *See* Undercover Call Transcript at 10:14-11:10 (App. 669); *see also* Horn Dec. at ¶3 (App. 83); Lagerberg Dec. at ¶3 (App. 156); Lutz Dec. at ¶3 (App. 328); Musselman Dec. at ¶3 (App. 378) (agent introduced herself as insurance sales agent, provided state license number, and told

7

believe they are speaking with legitimate agents who will help them purchase comprehensive health insurance.[15] In at least one instance, an agent took it a step further and led a consumer to believe the agent was directly associated with New Jersey's insurance marketplace.[16]

Defendants' representatives know exactly what consumers are looking for—consumers often make it clear on the calls that they are seeking primary health insurance plans for themselves and their families, including young children, after losing a job or moving to a new state, for instance.[17] For example, in an undercover call,[18] an FTC investigator posing as a consumer specifically stated that he had just gotten out of the Army, was unemployed, and needed a new primary health insurance plan to cover his various medical needs.[19]

Nevertheless, Defendants steer consumers away from recognizable or marketplace health insurance plans, often having supposedly discovered "bad news" that those plans' deductibles

---

consumer she could look up the agent); *see also* Aalto Dec. at ¶4 (App. 1) (consumer searched for agent's company—Golden State Advisors— and found a LinkedIn profile describing the company as a health insurance agency, giving her "reassurance" that she was speaking to a "licensed agent with a legitimate insurance agency.").

[15] Horn Dec. at ¶3 (App. 83) (agent "said he received my information from the portal, which I took to mean the Healthcare.gov website."); Musselman Dec. at ¶3 (App. 379) ("I thought that by entering my number on the Healthcare.gov website, only legitimate insurance companies would call me.").

[16] Singh Dec. ¶¶ at 4-5 (App. 403-404) (Defendants' agent convinced the consumer he was with "the enrollment center" of the "official New Jersey health insurance marketplace." The consumer "would not have remained on the call if [he] had known Defendants' agent was from a private company.") In another instance, a consumer assumed Defendants' agent was an insurance agent contracted by the government because she thought she had inquired through the Healthcare.gov website. *See* Musselman Dec. at ¶3 (App. 379).

[17] Horn Dec. at ¶¶ 3, 5 (App. 84-85) (consumer confirmed multiple times that the proposed plan would serve as her primary health insurance while job hunting); Lagerberg Dec. at ¶3 (App. 156); Declaration of Claire Stephan ("Stephan Dec.") at ¶3 (App. 499).

[18] On December 6, 2024, an FTC investigator conducted and recorded an undercover transaction to capture Defendants' sales pitch. *See* McPeek Dec. at ¶40 (App. 693); *Id.* at Attach. D (App. 1017) (undercover call recording); Undercover Call Transcript (App. 666-682).

[19] *See* Undercover Call Transcript at 7:3-7; 8:17-9:2 (App. 668-669).

are too high for the consumer or that the consumer would not qualify.[20] In the FTC investigator's transaction, for instance, Defendants' agent identified a particular "Bronze" plan as the investigator's most affordable ACA marketplace option, but falsely stated that this plan would not cover anything for the investigator until the deductible was met.[21]

Defendants instead declare they can get the consumer "approved" for a plan they call "regular insurance," "insurance," or "health insurance,"[22] at times equating the plan to recognizable insurance like Blue Cross Blue Shield.[23] Defendants claim it is "good news" they have found this plan for the consumer after purportedly evaluating their options based on the consumer's medical needs.[24] As described in more detail below, Defendants also use insurance-related terms in their sales pitch, such as "PPO," "copay," and "deductible."[25] Defendants further

---

[20] *Id.* at 19:1-15 (App. 671); *see also* Singh Dec. at ¶6 (App. 404) (the agent told the consumer "there was no way [he] would qualify for Medicaid coverage"); Aalto Dec. at ¶6 (App. 2) (the agent named insurance companies such as Anthem Blue Cross, Cigna, and Kaiser, and said these plans' deductibles were "extremely high"); Lee Dec. at ¶3 (App. 296).

[21] According to Ms. Young, the "Bronze" plan the agent mentioned would in fact cover doctor's visits, generic drugs, and diagnostic tests, with no deductible, for a lower premium than the product Defendants sold to the investigator. *See* Expert Dec. at pgs. 17-18 (App. 596-597).

[22] Undercover Call Transcript at 19:1-15; 25:12-14 (App. 671, 673); *see also* Declaration of Kathryn Giugliano ("Giugliano Dec.") at ¶3 (App. 54); Singh Dec. at ¶7 (App. 404); Musselman Dec. at ¶5 (App. 379); Stephan Dec. at ¶4 (App. 499); Aalto Dec. at ¶4 (App. 1).

[23] Lee Dec. at ¶3 (App. 296); Musselman Dec. at ¶5 (App. 379).

[24] Undercover Call Transcript at 17:2-14; 19:1-15 (App. 671). Defendants collect information including consumers' pre-existing medical conditions, physician preferences, and budget before evaluating and presenting their "best" options. *Id.* at 12:18-14:7 (App. 669-670); Lagerberg Dec. at ¶4-5 (App. 155-156); Horn Dec. at ¶3-4 (App. 83-84); Aalto Dec. at ¶4-7 (App. 1-2); Huff Dec. at ¶3 (App. 150); Stephan Dec. at ¶3 (App. 499); Musselman Dec. at ¶4-5 (App. 379).

[25] *See* Lagerberg Dec. at ¶4 (App. 156); Declaration of Alie Schreck ("Schreck Dec.") at ¶3-4 (App. 391); Musselman Dec. at ¶5-6 (App. 379); Aalto Dec. at ¶7 (App. 2); Singh Dec. at ¶7 (App. 404); Stephan Dec. at ¶4 (App. 499); Declaration of Ryan Sweeney ("R. Sweeney Dec.") at ¶3 (App. 543); Lee Dec. at ¶3 (App. 296).

claim that their plans will provide "nationwide" coverage for "doctor's visits, prescriptions, surgeries, and hospitalizations, all with no deductible."[26]

These misrepresentations convince consumers they are purchasing comprehensive health insurance. Comprehensive health insurance provides consumers with coverage for a comprehensive array of health care services[27] and limits their maximum out-of-pocket liability.[28] This has the effect of transferring the consumer's risk of incurring substantial medical costs to the insurer, so that the risk of incurring expensive medical costs is not borne by any one person alone but rather is shared across a large group of people. This is the essential and most critical function of health insurance.[29]

Defendants' products are not comprehensive health insurance plans.[30] Defendants instead enroll consumers into a portfolio of products, typically a bundle of fixed indemnity plans,[31]

---

[26] *See* Undercover Call Transcript at 19:17-24; 20:6-7 (App. 671).

[27] *See* Expert Dec. at pg. 3 (App. 582). Under the Affordable Care Act, health insurance is required to cover ten essential health benefits, including ambulatory patient services, emergency services, hospitalization, pregnancy, maternity, and newborn care, mental health and substance abuse disorder services, prescription drugs, rehabilitative and habilitative services and devices, laboratory services, preventive and wellness services, and pediatric service. *See* McPeek Dec. at Attach. C (App. 969-970).

[28] For the 2025 plan year, the maximum out-of-pocket limit was $9,200 for individuals and $18,400 for a family. *See* Expert Dec. at pg. 4 (App. 583); *see also* McPeek Dec. at Attach. C (App. 968).

[29] *See* Expert Dec. at pg. 2 (App. 581) (Health insurance shifts the risk of medical needs away from a single individual to a larger risk pool.)

[30] Ms. Young reviewed the products Defendants sold to the FTC investigator and thirteen consumers and concluded none constituted comprehensive health insurance. *See id.* at pgs. 1, 4-5, 14 (App. 580, 583-584, 593).

[31] A fixed indemnity plan provides fixed payments for specific health care events (*i.e.*, paying an enrollee $500 for each day of hospitalization.) This contrasts with comprehensive health insurance, where the insurer assumes responsibility for paying a share of the medical services the enrollee receives (*i.e.*, paying all of an enrollee's hospital bill, whether that bill is $10,000 or $100,000, less the enrollee's deductible payment). *See id.* at pgs. 5-7 (App. 584-586).

10

accident plans,[32] specified illness plans,[33] healthcare sharing ministries,[34] and membership associations.[35] These products, which can be broadly characterized as "limited benefit plans and medical discount memberships,"[36] at most offer only trivial benefits in exchange for the large monthly "premiums" consumers pay for them.[37] Most critically, these limited benefit plans and medical discount memberships, contrary to Defendants' representations, do not transfer the risk of expensive medical care away from the consumer, nor do they provide essential health benefits or cap consumers' exposure to health care costs.[38] As a result, Defendants' deceptive sales have exposed each of their victims to tens of thousands of dollars in potential medical costs.[39]

---

[32] An accident plan provides fixed payouts in the event of an accident (*i.e.*, paying an enrollee specific amounts from $3,750 to $7,500 if, after an accident, he had limb amputations or lost his vision or hearing, but no payment if the accident arose from a sports activity such as skiing or surfboarding). *See id.* at pg. 7 (App. 586).

[33] A specific illness or critical illness plan pays enrollees fixed amounts for certain disease diagnoses (*e.g.*, paying an enrollee $1,000 for a diagnosis of heart attack, stroke, or invasive cancer). *See id.* at pg. 8 (App. 587).

[34] A health care sharing ministry is a voluntary arrangement where members of a community with shared religious beliefs share medical costs. Often, members must attest to abiding by the ministry's shared beliefs. Unlike comprehensive health insurance, this product does not obligate an insurer to cover a member's full range of medical services and does not transfer the risk of expensive health care away from the member. *See id.* at pgs. 8-9 (App. 587-588).

[35] A membership association provides enrollees with discount benefits such as discounts on eyeglasses and some prescriptions. However, associations do not always provide healthcare-related benefits, sometimes offering discounts on car rentals and flower shops. *See id.* at pgs. 9-10 (App. 588-589).

[36] *Id.* at pg. 5, footnote 9 (App. 584).

[37] *See generally id.* at pgs. 4-15 (App. 583-594).

[38] *See id.* at pgs. 14-15 (App. 593-594). According to Ms. Young, Defendants also sold products which were not fully identifiable but were still not health insurance. *Id.* at pgs. 10-11 (App. 589-590).

[39] *Id.* at pg. 2, footnote 2 (App. 581) (Health expenditures vary, but in 2021, Americans with the most health care spending incurred an average of more than $70,000).

11

### 2.   Defendants Mischaracterize Their Proposed Plans as PPO Plans.

To further the illusion that Defendants are selling comprehensive health insurance, they call their products "PPO" plans, which they claim provide consumers access to "nationwide" provider "networks" through which they can see "any" preferred provider.[40] However, the products Defendants sell are not PPO plans.

A "PPO" or "preferred provider organization" plan is a type of health insurance that utilizes a "network" of medical providers. In a PPO plan, the insurer negotiates agreements with a group of "in-network" hospitals, doctors, pharmacies, and other providers who will accept a specific payment rate to treat the PPO plan's enrollees.[41]

At best, some of Defendants' fixed indemnity plans appear to "rent" a known PPO network, providing enrollees with potential discounts for a limited number of "in-network" providers. However, the fact that they may offer some discounts through a rented network does not qualify these fixed indemnity plans as PPO health insurance plans because they do not provide consumers with insurance coverage.[42]

For example, after promising the FTC investigator a "PPO" plan, Defendants actually sold the investigator a fixed indemnity plan that would provide only small, fixed discounts for specific medical events, such as a $75 discount for a doctor's visit.[43] So, unlike an actual PPO

---

[40] *See* Aalto Dec. at ¶7 (App. 2) (agent directed consumer to a "private insurance" plan, claimed the name of the network would be "First Health, like health insurance," and stated that "PPO" stands for "preferred provider organization" which means using a "provider that I prefer."); Undercover Call Transcript at 19:17-20 (App. 671); Horn Dec. at ¶4 (App. 84); Lagerberg Dec. at ¶4 (App. 156); Lee Dec. at ¶3 (App. 296); Schreck Dec. at ¶3 (App. 391); Musselman Dec. at ¶5 (App. 379); Stephan Dec. at ¶4 (App. 499); R. Sweeney Dec. at ¶3 (App. 543).
[41] Expert Dec. at pg. 16 (App. 595). Consumers on a PPO plan can receive flexible and full financial protection when choosing to see "in-network" providers.
[42] *Id.*
[43] *Id.* at pgs. 5-6 (App. 584-585).

12

plan, the investigator's plan would not have paid the balance of the bill for that doctor's visit, even if the specific doctor was, in Defendants' words, "in-network."[44] As a result, the investigator would have borne the out-of-pocket cost for a doctor's visit, which typically is hundreds of dollars.[45]

Consumers learn only after enrollment that Defendants' products are not PPO health insurance plans. In one instance, Defendants' agent offered a consumer a "PPO" plan, claiming that "because this plan was a PPO," the consumer could go to any "in-network" doctor or primary care physician ("PCP"). The agent also promised that any costs resulting from an in-network PCP visit, including lab work, would be "covered."[46] Relying on these promises, the consumer went to a supposedly "in-network" PCP only to be told that the plan she had purchased from Defendants was not health insurance and would therefore not cover the visit.[47]

> **3.    Defendants Misrepresent That Their Proposed Plans Will Provide Substantial Coverage for Consumers' Medical Needs and Limit their Liability, Failing to Disclose That the Plans Do Not Cap Liability.**

Defendants claim that their plans will provide substantial coverage for consumers' specific needs, such as upcoming surgeries, vaccinations, labor and delivery, and prescriptions.[48]

---

[44] *Id.* at pg. 16 (App. 595). Defendants frequently "look up" a consumer's doctor or hospital network before confirming they are "in-network" through the purported "PPO" plan. *See* Musselman Dec. at ¶7 (App. 379-380) (agent told consumer a specific pediatrician was "in network," which the consumer understood to mean she would not pay out-of-network costs for a visit); *see also* Undercover Call Transcript at 13:15-14:13 (App. 670); Horn Dec. at ¶4 (App. 84); Lutz Dec. at ¶3 (App. 328); Lee Dec. at ¶3 (App. 296).

[45] In 2021, the average cost for a physician visit was $360. *See* Expert Dec. at pg. 6 (App. 585).

[46] Horn Dec. at ¶4 (App. 84).

[47] *Id.* at ¶¶ 9-11 (App. 85-86).

[48] Huff Dec. at ¶3 (App. 150); Musselman Dec. at ¶4 (App. 379); Aalto Dec. at ¶7 (App. 2); R. Sweeney Dec. at ¶3 (App. 543); Giugliano Dec. at ¶3 (App. 54).

13

Defendants' agents do not disclose that the products that they sell at best provide small discounts for even very costly medical services, and include selective limitations on services.

For example, Defendants enrolled the FTC investigator into a fixed indemnity plan that would have provided only $250 for each day he was hospitalized, for a maximum of ten days.[49] This limited coverage pales in comparison to the average cost per day of hospitalization, which was $6,500 in 2015-2017.[50]

The investigator's experience was typical, and Defendants' actions can have devastating consequences for consumers.[51] For example, one consumer, Stefany Horn, told Defendants' agent that she was looking for new primary health insurance that covered PCP visits and emergency room ("ER") visits.[52] Defendants' agent offered a plan "based on [Ms. Horn's] needs." Despite these assurances, the products Defendants sold Ms. Horn would provide at most $50 for a trip to the ER.[53] Two months later, Ms. Horn ended up in the ER after a sudden allergic reaction and, left uninsured by Defendants, owed a $5,417 bill.[54]

---

[49] Expert Dec. at pgs. 5-6 (App. 584-585) (Other limited benefits on this fixed schedule include $500 for an inpatient surgery, $250 for an outpatient surgery, and limits on the number of times the patient can be paid (*e.g.*, only two doctor's visits, only one surgery.)).

[50] *Id.* at pg. 6 (App. 585) (In 2015 through 2017, among those with private health insurance who are managing chronic conditions, the average cost per day of hospitalization was $6,500. According to Ms. Young, this figure was published in a 2020 report, and expected costs are higher today.).

[51] *See id.* at pgs. 6-7 (App. 585-586) (Defendants sold similar fixed indemnity plans to consumers Horn, Lee, Lutz, Stephan, and the Sweeneys); *see also id.* at pg. 10 (App. 589) (Defendants sold the same membership to consumers Giugliano, Horn, and Stephan, and similar memberships were sold to consumers Lee and Lutz).

[52] Ms. Horn also confirmed multiple times that she was enrolling in this plan as her primary health insurance and that she would have no other health insurance coverage until she started a new job. *See* Horn Dec. at ¶¶3, 5 (App. 83-84).

[53] *See id.* at Attach. F-002 (App. 131).

[54] *See* Horn Dec. at ¶12 (App. 86-87) (Before seeking this ER treatment on April 27, 2024, Ms. Horn even went to the trouble of trying to pick an "in-network" hospital, per Defendants'

14

As another example, Ethan Lutz[55] told Defendants' agent he needed new health insurance because he was aging out of his state-sponsored program. Mr. Lutz shared that this plan had previously covered the costs of medications that treat his rare disease and explained that just one of these medications alone would cost $27,000 a month out-of-pocket. Mr. Lutz made it clear to the agent that he could not afford his prescriptions without health insurance. In response, Defendants' agent presented Mr. Lutz with a plan that they promised would give him the "best coverage – one that should cover most of [his] prescription costs." Relying on Defendants' promises, Mr. Lutz enrolled in the plan and several weeks later, received "Member ID" cards in the mail. When Mr. Lutz presented these cards to his pharmacy to fill his prescriptions, which were running low, the pharmacy staff informed him that his medication costs could not be covered by these discount programs.[56] Indeed, these cards state, "This is a limited benefit plan…" and "DISCOUNT PROGRAM ONLY. NOT AN INSURANCE PROGRAM."[57] Combined, all of Mr. Lutz's medications cost more than $70,000 per month out-of-pocket, but Defendants left Mr. Lutz without any coverage for their costs.[58]

Finally, Defendants entice consumers by using cost-sharing terms commonly associated with health insurance, claiming that their products have no or low "deductibles" and nominal "copays," leading consumers to believe that their portion of responsibility for medical costs will

---

instructions during the sales call. Still, the hospital denied Defendants' plan as health insurance coverage for her treatment, leaving Ms. Horn with outstanding bills that she was still paying off in July 2025.).

[55] *See generally* Lutz Dec. ¶¶2-11 (App. 328-331).

[56] Ms. Young reviewed Mr. Lutz's plan documents and concluded that Defendants enrolled Mr. Lutz in a fixed indemnity plan and membership association, not comprehensive health insurance. *See* Expert Dec. at pg. 12 (App. 591).

[57] Lutz Dec. at ¶7 and Attach. E-001 (App. 330, 364).

[58] *Id.* at ¶8 (App. 330).

15

be limited or low.[59] But Defendants fail to disclose that these plans do not limit consumers' potential share of medical costs, the way true copays and deductibles would for comprehensive health insurance plans.

When Defendants' agents promise that the consumer can expect, say, a $10 "copay" for visits to primary and specialist physicians and a $25 "copay" for an urgent care visit,[60] they represent that that is all the consumer will have to pay. They fail to disclose that the "copay" is the *minimum* the consumer will pay. In fact, the consumer remains responsible for the rest of the bill, less the plan's inadequate fixed payments. For instance, some of the fixed indemnity plans sold by Defendants misleadingly offer $10 "patient pays," which do not limit the consumer's costs. Instead, such plans require that the consumer pay $10 at the time of service; later, the indemnity plan may pay an additional amount directly to the provider, but the consumer remains on the hook for the balance, which can be substantial.[61]

After reviewing Defendants' various products, Christen Linke Young, a health insurance expert, has concluded that, even if bundled together, Defendants' products would cover only a fraction of a patient's costs should they require expensive medical care.[62] While current federal law requires total patient cost-sharing in comprehensive health insurance to be capped at no more than $9,200, consumers who purchased limited benefit plans and medical discount memberships from Defendants are left exposed to the risk of incurring astronomical medical bills.

---

[59] *See* Undercover Call Transcript at 20:6-7, 36:8-15 (App. 671, 675); Lagerberg Dec. at ¶4 (App. 156-157); Schreck Dec. at ¶3 (App. 391); Stephan Dec. at ¶4 (App. 499); Musselman Dec. at ¶6 (App. 379); Singh Dec. at ¶7-8 (App. 403-404).
[60] Undercover Call Transcript at 36:8-25 (App. 675).
[61] Expert Dec. at pgs. 15-16 (App. 594-595).
[62] *Id.* at pgs. 15-16 (App. 594-595).

### C.   Defendants Force Sales with Deceptive Disclosures and Heavy-Handed Sales Tactics

In addition to making the deceptive misrepresentations and omissions discussed above, Defendants' agents employ heavy-handed scripted tactics to secure their sales. When consumers express hesitancy or want to call back after weighing their options or consulting with family, Defendants convince consumers they must stay on the line and act today, claiming their "offers don't last long."[63] When consumers ask for plan documentation, Defendants deflect and refuse to provide anything in writing until after the consumer's purchase and enrollment.[64]

On one sales call, Defendants' agents even became antagonistic when a consumer, Christina Aalto, decided to back out of enrollment mid-call.[65] When Ms. Aalto told the sales agent she was seeing reviews online that the proposed product was a scam, the agent immediately brought a supervisor on the line. The supervisor launched into a pitch to save the sale, trying to rationalize that even Blue Cross Blue Shield and Disney World get bad reviews online too. When Ms. Aalto tried to end the call, the supervisor became confrontational and accused Ms. Aalto of not being able to afford the plan.[66]

Defendants also use a bogus "verification" process of purported consumer disclosures to ultimately collect the consumer's signature on an "application." At this stage of the call, however, consumers have already provided their payment information to Defendants. Moreover,

---

[63] *See, e.g.*, Lagerberg Dec. at ¶5 (App. 157); *see also* Schreck Dec. at ¶¶ 4-5 (App. 391).

[64] Lagerberg Dec. at ¶4 (App. 156) ("I asked [Defendants' agent] to send me information in writing. [The agent] said he would only send documentation after the call."); *see also* Aalto Dec. at ¶8 (App. 3); Undercover Call Transcript at 25:18-26:16 (App. 673) (agent evades investigator's request for a pamphlet to review before purchasing).

[65] Ms. Aalto recorded her call with Defendants' agents. *See* Transcript of Christina Aalto Call Recording ("Aalto Call Transcript") (App. 8-53).

[66] *See* Aalto Dec. at ¶11 (App. 4).

17

Defendants discourage consumers from fully considering the disclosures, stating, for instance, that "the majority of them will not pertain to you," or that the disclosures are "just terminology."[67] Verification agents also instruct consumers to answer clearly "yes or no" when asked whether they understand the disclosures, cautioning consumers not to interrupt or ask questions; otherwise they will be transferred back to the initial sales agent and start the process all over.[68]

At times during the purported "verification" disclosures, Defendants ask consumers to confirm their understanding that they are not purchasing major medical or comprehensive health insurance.[69] However, these statements perpetuate, rather than remedy, Defendants' deception. When Defendants state that their plans are not considered comprehensive health insurance, they assure consumers it is only because the plan does not cover things the consumer "obviously" does not need, such as pregnancy, substance abuse, and long-term inpatient psychiatric services.[70] These statements are entirely false; as discussed above, the plans Defendants sell are not comprehensive health insurance for many additional reasons, including that they do not shift cost-bearing risk away from the consumer.[71] Not only do Defendants' false statements and qualifications nullify the effects of their disclosures, but they also reinforce Defendants'

---

[67] Undercover Call Transcript at 39:1-4; 40:13-17 (App. 676).

[68] *See, e.g., id.* at 44:21-45:12 (App. 677-678); Lee Dec. at ¶4 (App. 296-297); Musselman Dec. at ¶9 (App. 380).

[69] Undercover Call Transcript at 40:1-17 (App. 676).

[70] *See id.* at 48:4-49:8 (App. 678-679); Aalto Dec. at ¶9 (App. 3) (agent explained to consumer that her plan was only called "limited" because it did not cover drug and alcohol treatment, in-patient medical [sic] health, and pregnancy); *see* Musselman Dec. at ¶8 (App. 380).

[71] *See* footnote 38 and accompanying text, *supra.*

deception, clearly signaling to consumers that they are getting a comprehensive health insurance plan in all other respects.[72]

Defendants' written "disclosures" are equally ineffective. Defendants' agents send an electronic agreement to consumers by mobile link and pressure consumers to quickly scroll through long, densely worded text on their mobile devices. The agents claim the agreement covers topics they have already discussed and rush consumers to sign or check boxes in the agreement without giving them an opportunity to review the text.[73] Defendants end their call soon after this "verification" process.

**D.      Defendants Harm Consumers and Expose Them to Severe Injury.**

At a minimum, Defendants' schemes cause consumers to pay hefty enrollment fees and premiums for dubious products.[74] Even worse, Defendants' conduct exposes consumers to crushing medical costs.

---

[72] Expert Dec. at pg. 17 (App. 596).

[73] *See, e.g.,* Stephan Dec. at ¶5 (App. 499-500) (agent pressured the consumer to sign the document immediately or she would not be able to guarantee the premium they had discussed); Schreck Dec. at ¶6 (App. 392); Lee Dec. at ¶4 (App. 297); Lutz Dec. at ¶5 (App. 329); Lagerberg Dec. at ¶7 (App. 158); R. Sweeney Dec. at ¶4 (App. 543-544).

[74] Some consumers attempt to cancel soon after the sale; others pay many months of premiums before they realize they are not getting what they paid for. For example, in December 2021 and June 2022, Ryan and Natasha Sweeney purchased plans for their family from Defendants, and paid monthly premiums, at times as high as $800 per month, until November 2023. *See generally* R. Sweeney Dec. at ¶¶2-8 (App. 543-545). In addition, it is often difficult for consumers to cancel Defendants' products. Consumers who attempt to cancel have trouble reaching anyone, are forced to call multiple times, experience repeated transfers and long hold times, and encounter argumentative representatives. *See, e.g.* Singh Dec. at ¶10 (App. 405); Schreck Dec. at ¶10 (App. 393); Stephan Dec. at ¶7 (App. 500); Musselman Dec. at ¶¶11-14 (App. 381-382); Lee Dec. at ¶¶7-8 and Attach. D (App. 297-299, 311-322); Lutz Dec. at ¶10 (App. 331); Lagerberg Dec. at ¶¶11-12 (App. 159); Giugliano Dec. at ¶¶7-10 (App. 55-56); Huff Dec. at ¶6 (App. 151). Some consumers have had to file BBB complaints, dispute credit card charges, or cancel their credit cards to stop the billing. *See, e.g.,* Schreck Dec. at ¶11 (App. 393); Stephan Dec. at ¶7 (App. 500); Lutz Dec. at ¶10 (App. 331).

19

For example, as discussed *supra*, one consumer who specifically told Defendants' agent that she needed a primary health insurance plan that would cover ER visits ended up owing over $5,000 in unexpected ER costs after suffering an allergic reaction.[75] Another consumer attempted to use Defendants' products to seek treatment for a shoulder injury and her son's broken arm. After receiving an unexpected $50 check in the mail from the fixed indemnity plan and a small discount off her ER visit, the consumer ended up owing over $8,000 in unexpected medical bills for these injuries.[76] A third consumer, also discussed *supra*, specifically asked Defendants' agent for a health insurance plan that would cover his $27,000-per-month, life-sustaining medication. Instead, the agent sold the consumer a fixed indemnity plan and membership association which provided no coverage when he later tried to refill his medication.[77]

As detailed above, Defendants are aware that their customers are seeking comprehensive health insurance, not limited benefit plans and medical discount memberships.[78] They are also aware how health insurance functions to protect consumers against incurring out-of-pocket medical costs.[79] Knowing all this, Defendants continue leaving consumers uninsured while filling their own pockets with tens of millions of dollars in commissions for these deceptive sales.

---

[75] *See* footnote 54 and accompanying text, *supra*.

[76] *See* Declaration of Natasha Sweeney ("N. Sweeney Dec.") at ¶¶5-6 (App. 554).

[77] *See* footnotes 55-56 and accompanying text, *supra*.

[78] *See* footnote 17, 19 and accompanying text, *supra*.

[79] Schreck Dec. at ¶4 (App. 391) ("[Defendants' agent] told me that he was glad that he himself has health insurance to cover him in the event of an emergency."); *see also* Undercover Call Transcript at 20:24-22:18 (App. 671-672) (When the investigator asked for a "cheaper" plan, Defendants' agent admitted Blue Cross would have a lower premium but a high deductible, which he claimed would not "really serve you any purpose if you're paying 330 a month and paying for all your medical bills out of your own pocket.").

20

## II.   DEFENDANTS

Individual Defendants Tiffanie Gonzalez, Ramzey Hassoun, and Richard Sargent operate their deceptive telemarketing scheme through a maze of interrelated corporations consisting of Defendants Top Healthcare Options Insurance Agency Inc ("THO"), Golden State Advisors Insurance Agency LLC ("Golden State Advisors"), Top Healthcare Solutions LLC ("Top Healthcare Solutions"), Direct Health Solutions Insurance Agency, LLC ("Direct Health Solutions"), Prime Healthcare Solutions Insurance Agency LLC ("Prime Healthcare Solutions"), Premier Services Group Hub LLC ("Premier Services Group"), Elevation Media Group LLC ("Elevation Media Group"), Sargent Financial LLC ("Sargent Financial") d/b/a WeMake Media LLC (WeMake Media), and Ramz Media Marketing LLC ("Ramz Media Marketing").

### A.   Individual Defendants

Tiffanie Gonzalez, Ramzey Hassoun, and Richard Sargent are responsible for the founding and growth of this enterprise. On paper, Gonzalez is the President of THO, which she formed in approximately May of 2019,[80] but Gonzalez has testified[81] that Hassoun and Sargent are her business partners and that they all make their business decisions together.[82] According to Gonzalez, she previously worked at a telemarketing company where she sold mainly short-term medical insurance, limited indemnity plans, and ancillary products such as accidental death and

---

[80] Declaration of Christopher McGuire ("McGuire Dec") at ¶8 and Attach. B (App. 608, 613); McPeek Dec. at Attach. A (App. 715-716).

[81] In May 2023, Gonzalez gave deposition testimony in connection with a contract dispute with THO's previous upline company. *See* discussion at pg. 25, *infra*; *see also generally* McPeek Dec. at Attach. F (App. 1273-1362).

[82] *Id.* at App. 1297.

21

disability insurance,[83] and that she met Ramzey Hassoun at this company before the two left to start THO in 2019.[84]

According to Gonzalez, she and Hassoun hired employees, created a quality assurance department, wrote their own sales scripts, and directly trained sales representatives.[85] Early on, Gonzalez and Hassoun also worked together to secure contracts with, on the front end, lead generators that lure consumers to Defendants to call, and, on the back end, with third party plan administrators ("TPAs") whose products Defendants sell.[86] TPAs maintain the licenses and contracts for the products sold by telemarketers like Defendants and pay commissions for the sales Defendants generate.[87] In establishing these relationships, Gonzalez and Hassoun would send emails on behalf of THO with a joint email signature, with Gonzalez as "President" and Hassoun as "Data Management."[88] In addition to being "in charge" of leads for THO, Hassoun

---

[83] *See* McPeek Dec. at Attach. F (App. 1275).

[84] *Id.* at App. 1288-1289.

[85] *Id.* at App. 1283; *see also id.* at App. 1298-1 (Gonzalez developed her own sales scripts); *Id.* at App. 1298 (Gonzalez has stated that she was "very focused on trying to train my reps to be cohesive with the way we wanted them to do things.")

[86] THO "sourced" their lead generators through Hassoun's relationships from his previous call center jobs and early on was "in charge" of leads. *Id.* at App. 1283; *see also id.* at App. 1297 (Gonzalez makes her decisions with Hassoun). In 2019, THO contracted to become a producer for TPAs Premier Health Solutions and Adroit Health Group. *See id.* at App. 1299-1321, 1323-1346). Adroit Health Group ("Adroit") describes itself as a "business entity insurance agency that provides third-party sales producers with an enrollment platform through which consumers are able to obtain certain insurance and non-insurance products." *See* Schreck Dec. at Attach. A-001 and A-002 (App. 395-396). Adroit, a Texas company, also goes by Strata Health Group. *See* McPeek Dec. at Attach. B (App. 939).

[87] *Id.* at Attach F. (App. 1278) (TPAs work with carriers and hold licenses); *see also id.* at App. 1306 (Adroit, a TPA, agreed to pay commissions to THO).

[88] *Id.* at App. 1350.

supervises THO's "front end sales training." Despite not having a license to sell health insurance, Hassoun manages and trains agents to sell Defendants' products.[89]

When first starting THO, using Hassoun's contacts in the sales industry,[90] Gonzalez hired several sales agents, including Richard "Ricky" Sargent. Sargent has since become Gonzalez's other business partner according to Gonzalez, and is "highly compensated."[91] By title, Sargent is THO's "Director of Operations" and interfaces with both Defendants' lead generators and TPAs.[92] For example, Sargent (and Gonzalez) have received notifications from MediaAlpha whenever consumers submit a request not to use the consumer's data for marketing purposes.[93] Sargent also maintains THO's relationship with its call management platform vendor[94] and sets up consumer-facing websites for THO and Premier Services Group Hub.[95] Sargent, who started out as a THO agent, has himself been the subject of consumer complaints alleging he was forging consumer signatures and misrepresenting non-health insurance products as "actual insurance."[96]

Individual Defendants have expanded THO's practices to the other Corporate Defendants. As discussed further below, Individual Defendants have registered THO, Golden State Advisors, Premier Services Group Hub, Elevation Media Group, Sargent Financial, and

---

[89] *Id.* at App. 1285-1286, 1347; *see also id.* at App. 1288 (Hassoun has a history of working as a sales trainer and in the sales of healthcare products, despite not having a license).
[90] *Id.* at App. 1289-1290 (Hassoun is known to be well-connected in the sales industry).
[91] *Id.* at App. 1285-1286; *see also id.* at App. 1283 (When Gonzalez promoted Sargent, she "taught him everything that [she] knew, and he took over" certain roles.)
[92] McKenney Dec. at Attach. K (App. 659); *see also* McPeek Dec. at Attach. F (App. 1361-62).
[93] McKenney Dec. at Attach. K (App. 659).
[94] McPeek Dec. at Attach. F (App. 1283-1284). Convoso is a "software platform commonly used by call centers to manage outbound and inbound sales calls." McGuire Dec. at ¶6 (App. 607).
[95] McPeek Dec. at ¶50-52 (App. 695).
[96] *Id.* at Attach. F (App. 1348-1349, 1352-1356)

23

Ramz Media Marketing in their own names, have opened bank accounts and corporate credit cards for each of these Defendants, and often jointly manage these Defendants' finances and operations.[97] Individual Defendants direct the employees who do the same for Defendants Top Healthcare Solutions, Direct Health Solutions, and Prime Healthcare Solutions.[98]

Individual Defendants are aware of consumers' complaints about their companies' sales tactics and products. They maintain a quality assurance department and have been the subject of lawsuits alleging deceptive telemarketing tactics.[99] Gonzalez also knew of specific consumer complaints against Sargent, THO, and Top Healthcare Solutions that detail Defendants' deceptive marketing of the products they sell as the equivalent of insurance.[100] Moreover, Gonzalez is on notice of her companies' telemarketing obligations; she has signed contracts with the TPAs that pay their commissions, promising, on behalf of Defendants, to strictly comply

---

[97] *See* McPeek Dec. at ¶27, 67 (App. 689, 702); *see also* footnote 117, *infra.*

[98] John Mahaney, Amer Elaref, and Ryan Froio, managers of these Defendants respectively, are known employees of THO. *See* McPeek Dec. at Attach. F (App. 1322) (listing Mahaney as a THO agent); *see also* McGuire Dec. at ¶9 and Attachs. C and D (App. 608, 614-615) (Elaref and Froio's licenses are displayed on the wall of THO's offices). Mahaney, Elaref, and Froio are signatories of these Defendants' financial accounts. McPeek Dec. at ¶67 (App. 702).

[99] *See* McPeek Dec. at Attach. F (App. 1283); *see also id.* at App. 1296 (THO has received "TCPA complaint[s]". For example, in 2024, THO was the subject of a Telephone Consumer Protection Act ("TCPA") complaint alleging THO engaged in violative telemarketing practices. *See Leon Weingrad v. Top Healthcare Options Insurance Agency Inc.*, No. 2:23-cv-05114 (Dkt. 12) (E.D. Pa. June 28, 2024).

[100] *See* footnote 96, *supra.* (Gonzalez received notice of consumer complaints against Sargent and THO, alleging Sargent was forging member signatures and representing products as "actual insurance"); *see also* McPeek Dec. at Attach. F (App. 1357-1360) (Gonzalez was notified of a complaint against a Top Healthcare Solutions agent who offered a consumer "true health insurance, just like you would get at work" through which "80% of the medication cost would be covered." Gonzalez was informed that this was the sort of language that could get them "in a world of trouble." Gonzalez responded that she would retrain or terminate the agent).

24

with the "Federal Trade Commission Telemarketing Sales Rule" and "all other Federal and state telemarketing sales rules."[101]

## B.     THO

In its early days, THO operated as a "downline" of another telemarketing company called NXT Level Health ("NXT").[102] In 2020, THO left NXT on bad terms, causing a contract dispute over unpaid commissions.[103] During this litigation, Gonzalez provided deposition testimony wherein she explained that a downline company working directly under an "upline" company receives the upline's initial and ongoing resources and support, and in exchange, pays a percentage of its sales, or commissions, to the upline.[104] Gonzalez also attested to detailed aspects of THO's business. Since leaving NXT, THO has spawned its own downlines and created a growing enterprise of call centers that operate out of a commercial complex in Deerfield Beach, Florida.[105]

According to investigators with the Florida Department of Financial Services, Division of Agent & Agency Services, Bureau of Investigation (the "Department"), this complex has been known to the Department as an ongoing hub of unlicensed health insurance telemarketing activity.[106] In July 2024, investigators with the Department conducted a site visit to 500 Fairway

---

[101] McPeek Dec. at Attach. F (App. 1302).

[102] *Id.* at App. 1287, 1291 (Hassoun introduced Gonzalez to NXT and THO became NXT's downline).

[103] *See* Complaint, *NXT Level Health, LLC v. Top Healthcare Options Insurance Agency Inc*, No. CACE 20-021301 (Broward County, December 18, 2020).

[104] McPeek Dec. at Attach. F (App. 1279-1281).

[105] *Id.* at App. 1281 (at the time of Gonzalez's deposition, THO had nine downlines, some of which have their own downlines). Evidence shows that Corporate Defendants are currently registered and operating out of: (1) 401 Fairway Drive, Suite 300; (2) 500 Fairway Drive, Suite 102; (3) 500 Fairway Drive, Suite 101, and (4) 450 Fairway Drive, Suite 204. *See* McPeek Dec. at ¶27 (App. 689); *see also* McGuire Dec. at ¶¶12, 16 (App. 609, 611).

[106] McGuire Dec. at ¶4 (App. 607).

Drive, Suite 102 and confirmed that THO and Gonzalez were operating a call center and engaging in the telemarketing of purported health insurance.[107] Gonzalez was present at the time of the visit and identified herself as the owner and President of THO.[108]

### C.   Downline Corporate Defendants

Today, THO operates through a series of other companies that it directs and from which it collects revenue. THO has commissioned "downline" companies, including Defendants Golden State Advisors, Top Healthcare Solutions, Direct Health Solutions, and Prime Healthcare Solutions ("Downline Defendants"), as the telemarketers in the scheme.

Downline Defendants operate call centers that have been formed by Individual Defendants or one of their employees. Sargent and Sargent Financial are registered managers of Golden State Advisors, while known THO agents are registered as managers of Top Healthcare Solutions, Direct Health Solutions, and Prime Healthcare Solutions.[109] According to Gonzalez, THO devotes "extensive resources"[110] to support its downlines, including Downline Defendants. THO helps Downline Defendants find and furnish office spaces, and connects them to lead generators and to Defendants' common dialer, Convoso. THO then continues to provide

---

[107] *See* McGuire Dec. at ¶¶3-10 (App. 606-609); *see also* Declaration of Glenn Chapter ("Chapter Dec.") at ¶¶6-7 (App. 618-619). The investigators observed that sales agents were using known software platforms used in health insurance telemarketing. *See* McGuire Dec. at ¶6 (App. 607).

[108] Gonzalez handed to Department investigators a business card that identified Gonzalez as President of Top Healthcare Options. *See* McGuire Dec. at ¶8 and Attach. B (App. 608, 613).

[109] McPeek Dec. at ¶27 (App. 698). Several of these same agents, now managers, have deceptively sold limited benefit plans and medical discount memberships to consumers. *See e.g.*, Giugliano Dec. at ¶9 and Attach. C-001 (App. 56, 80); Stephan Dec. at ¶8 and Attach. A (App. 501, 503); Singh Dec. at ¶¶4-8 (App. 403-404); Lee Dec. at ¶5 and Attach. B-001 (App. 297, 308).

[110] McPeek Dec. at Attach. F (App. 1279). At times, THO also sends funds to its downlines as they are getting started. *See* McPeek Dec. at ¶58 (App. 697-698).

26

Downline Defendants ongoing support and assist them with compliance and legal issues.[111] THO

and Downline Defendants employ more than one hundred employees[112] and share sales agents

who sell the same or similar products administered by the same TPAs.[113] In exchange for this

support, Downline Defendants pay THO commissions, at times as high as 45%.[114]

Individual Defendants and their employees direct and monitor Downline Defendants'

operations. Indeed, Gonzalez manages Downline Defendants' relationships with TPAs, is

notified when complaints are made against Downline Defendants, and publicizes job postings for

Downline Defendants.[115] Moreover, Sargent is a registered manager of Golden State Advisors

and is the sole signatory on Golden State Advisors' corporate credit card account.[116]

### D.    Operational Support Defendants

To further support Defendants' telemarketing operations, Individual Defendants have

also formed companies to provide operational support to the enterprise and to compensate

themselves. These companies include Defendants Premier Services Group, Elevation Media

---

[111] McPeek Dec. at Attach. F (App. 1279-1280).

[112] McPeek Dec. at Attach. C (App. 1004) (Gonzalez has boasted that early on, THO's workforce increased from eight to one hundred employees in less one year).

[113] *See* footnote 51, *supra*. Adroit Health Group administered the plans purchased by consumers Huff. See Huff Dec. at Attach. A-001 (App. 153); Horn Dec. at Attach. B-001 (App. 102); Lee Dec. at Attach. D-008 (App. 318); Lutz Dec. at Attach. B-002 (App. 344); R. Sweeney Dec. at Attach. B-001 (App. 547); Stephan Dec. at Attach. A-001 (App. 503); Schreck Dec. at Attach. A-002 (App. 396); *see also* footnote 127, *infra*.

[114] McPeek Dec. at Attach. F (App. 1279).

[115] McPeek Dec. at Attach. F (App. 1351). (Gonzalez introduced her agent John Mahaney and Top Healthcare Solutions to her TPA but stated that they would still be doing business under THO); *see* footnote 100, *supra* (Gonzalez is notified when complaints are made against her downlines); *see also* McPeek Dec. at Attach. C (App. 942-943) (capture of Gonzalez's LinkedIn page posting Golden State Advisors job posting).

[116] *See id.* at ¶67 and Attach. I (App. 702, 1501).

27

Group, Sargent Financial, and Ramz Media Marketing ("Operational Support Defendants"). These Defendants are owned and managed only by Gonzalez, Hassoun, or Sargent.[117]

Operational Support Defendants handle general compliance and human resources services, such as payroll, onboarding, and taxes.[118] For example, Premier Services Group offers "comprehensive administrative support" to the other Defendants such as: agency licensing, licensing compliance, general compliance, payroll, administration, resource and education, quality control, and recruiting support.[119] Evidence demonstrates that accounts for Elevation Media Group, Ramz Media Marketing, and Sargent Financial are also used to pay ADP wage and payroll fees, corporate filings, licensing fees, lead generation, attorneys, and IRS taxes.[120]

Evidence also demonstrates a constant flow of funds between Operational Corporate Defendants, Individual Defendants, and the other Corporate Defendants for personal expenses.[121] For example, THO alone has funneled more than $9.5 million to Elevation Media Group since 2020.[122] Other Defendants have also made substantial deposits to Elevation Media Group's accounts. In addition to funding operations, as discussed above, Elevation Media Group also

---

[117] Gonzalez owns Premier Services Group Hub and Elevation Media Group. Hassoun owns Ramz Media Marketing. Sargent owns Sargent Financial (d/b/a WeMake Media LLC). *See* McPeek Dec. at ¶18-27 (App. 687-689). WeMake Media LLC is a lead generation company that was started by THO. *See* McPeek Dec. at Attach. F (App. 1293). At times, Individual Defendants jointly manage these companies—both Hassoun and Gonzalez handle Elevation Media Group's finances while all Individual Defendants are associated with THO and WeMake Media. *See* McPeek Dec. at ¶67 (App. 702).

[118] For example, Premier Services Group receives "monthly" payments from the other Defendants, including for "general compliance" services and "on-boarding fees." *See id.* at ¶69 (App. 702-703); *see also id.* at ¶51 (App. 695) (Sargent used the email address humanresources@servicegrouphub.com to register Premier Service Group's website domain).

[119] *Id.* at Attach. C (App. 972) (capture of Premier Service Group's website).

[120] *See id.* at ¶72-78 (App. 703-704).

[121] *See id.* at ¶58 (App. 697-698).

[122] *See id.* at ¶72 (App. 703).

28

pays for Gonzalez's personal expenses including her handyman, massage therapist, and tattoo artists.[123] In the summer of 2020, Gonzalez also paid for her home out of Elevation Media Group's funds.[124] Likewise, Hassoun and Sargent use Ramz Media Marketing and Sargent Financial like personal bank accounts, purchasing hundreds of thousands of dollars in personal expenses, as detailed below.[125]

### E.    Common Enterprise

As demonstrated by multiple recent law enforcement inspections and public corporate filings, Defendants operate out of the same or neighboring suites, which Individual Defendants frequent, in a complex of commercial buildings in Deerfield Beach, Florida.[126]

In addition to sharing offices, Defendants also share sales agents.[127] In the FTC's undercover call, a representative confirmed that the investigator had reached THO before transferring the line to a "licensed" sales agent, Stephen Kelley.[128] Evidence shows that Kelley is

---

[123] *See id.* at ¶66 (App. 702).

[124] *See id.* at ¶65, 86-87 (App. 701, 706)

[125] *See infra* at pp. 30-31; *see also* McPeek Dec. at ¶61-64, 82, 85 (App. 699-701, 706, 707).

[126] As of December 8, 2025, Department investigators have confirmed that Suite 102 is still occupied by what appears to be an active call center. *See* McGuire Dec. at ¶16 (App. 611). Currently, Golden State Advisors is registered at this location, as are other entities registered by Sargent and Hassoun. *See* McPeek Dec. at ¶27-28 (App. 689-691). Department investigators have also confirmed that active call centers are operating out of: 500 Fairway Drive, Suite 101, where Top Healthcare Solutions is currently registered; 401 Fairway Drive, Suite 300, where THO is now registered; and 450 Fairway Drive, Suite 204, where Prime Healthcare Solutions and Direct Health Solutions are registered. *See* McGuire Dec. at ¶16 (App. 611); *see also* McPeek Dec. at ¶27 (App. 689). In September and December 2025, Department investigators also confirmed the presence of Individual Defendants' vehicles parked around these locations. *See* McGuire Dec. at ¶¶15, 17 (App. 610-611).

[127] For example, Rachael Lanneaux is a known THO agent. *See* McGuire Dec. at ¶ 9 (App. 608). Meanwhile, on separate occasions, Lanneaux has made sales to consumers as an agent of both Golden State Advisors and Prime Healthcare Solutions. Huff Dec. at Attach. A-001 (App. 153); Musselman Dec. at Attach. A-002 (App. 385).

[128] Undercover Call Transcript, at 10:1-25, 32:9-16 (App. 669, 674).

a sales agent for, at minimum, both THO and Golden State Advisors, and has received payments from Sargent, Hassoun, and Amer Elaref, a manager of Direct Health Solutions.[129] Although the investigator had placed the call to THO's number, he later received enrollment documents identifying Stephen Kelley as an agent with "Golden State Advisors Insurance Agency LLC."[130]

Defendants earn tens of millions of dollars in commissions in exchange for selling the same TPAs' products.[131] For example, from 2019 through 2024, THO, Direct Health Solutions, Golden State Advisors and Prime Healthcare Solutions received more than $41 million from Adroit alone.[132] Defendants have also received commission payments from previous FTC defendant Health Plan Intermediaries Holdings ("HPIH").[133]

Individual Defendants and their employees funnel these millions back into their enterprise and to fund extravagant personal lifestyles. Individual Defendants have spent hundreds of thousands of dollars of corporate funds on luxury and fine goods, tickets to live sporting events, charter yachts, and entertainment at gentlemen's clubs.[134] For example, Defendants have charged to their corporate cards $8,700 purchases from Louis Vuitton, $30,000 jewelry

---

[129] Kelley's license has been displayed on the wall of THO's offices at 500 Fairway Drive, Suite 102. See McGuire Dec. at ¶9 and Attach. D (App. 608, 615).

[130] McPeek Dec. at Attach. E (App. 1022).

[131] *Id.* at ¶54-55 (App. 696).

[132] *Id.* at ¶54 (App. 696).

[133] *Id.* at ¶55 (App. 696). Health Plan Intermediaries Holding ("HPIH") was a named defendant in the FTC's settlement with Benefytt, a third party administrator ("TPA"). *See FTC v. Benefytt Techs., Inc.*, Case No. 8:22-cv-01794-TPB-JSS (M.D. Fla., Aug. 11, 2022)). Benefytt (and HPIH) had agreed to pay $100 million to settle the FTC's case against them, which alleged that they had operated deceptive websites targeting consumers searching for comprehensive health insurance and had sold them sham plans. Benefytt had administered plans also sold by another FTC defendant Simple Health. *See FTC v. Simple Health Plans LLC, et al.*, Case No. 18-cv-62593-DPG (S.D. Fla, February 7, 2024) (granting summary judgment against defendants for operating a "bait and switch scheme" and selling consumers "practically worthless limited indemnity or discount plans.").

[134] McPeek Dec. at ¶61-64 (App. 699-701).

purchases, and $19,000 dining bills.[135] Individual Defendants and their employees also charge to their corporate cards weekend trips to Las Vegas and Cancun, lodging at Ritz Carltons and luxury resorts, and European family vacations in London, Paris, and Rome.[136] Notably, in the summer of 2020, Gonzalez purchased her current home residence using funds from Elevation Media Group.[137]

## III.   ARGUMENT

This Court should issue an *ex parte* TRO enjoining Defendants' illegal practices and imposing other relief that will preserve its ability to compensate consumers for their losses. The Court has authority to issue the requested relief, the FTC meets the relevant standards for preliminary injunctive relief, and the scope of the proposed relief is necessary and appropriate.

### A.   This Court Has the Authority to Grant the Requested Relief.

The FTC brings this action under Sections 13(b) and 19(a)(1) of the FTC Act, 15 U.S.C. §§ 53(b), 57b, which together authorize preliminary and final injunctive and monetary relief for violations of FTC-enforced laws. Section 13(b) allows for injunctive relief to stop unlawful conduct. 15 U.S.C. § 53(b); *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021); *FTC v. WV Universal Mgmt., LLC*, 866 F.3d 1234, 1239 (11th Cir. 2017).[138] For violation of certain rules, including the Telemarketing Sales Rule, 16 C.F.R. § 310, at issue here, Section 19 of the FTC Act grants the courts "jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the

---

[135] *Id.* at ¶63-64 (App. 700-701).
[136] *Id.* at ¶61 (App. 699-700).
[137] *See* footnote 124, *supra.*
[138] 15 U.S.C. § 53(b) provides that, "in proper cases the Commission may seek," and "the court may issue, a permanent injunction," which also encompasses a preliminary injunction.

31

rule violation or the unfair or deceptive act or practice[.]" 15 U.S.C § 57b(b).[139] Section 19 also

grants courts authority to take measures to preserve funds for monetary relief, including asset

freezes and receiverships. *FTC v. Simple Health Plans, LLC*, 58 F.4th 1322, 1329-30 (11th Cir.

2023); *see also FTC v. Start Connecting, LLC*, No. 8:24-cv-1626-KKM-AAS, 2024 WL

3990084, at *2 (M.D. Fla. Jul. 11, 2024) (TRO granting asset freeze and receivership under

Section 19 and citing *Simple Health Plans*); *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2021

WL 4318466, at *5 (D. Ariz. Sept. 23, 2021) (continuing asset freeze to preserve assets for

potential damages award under Section 19), *appeal dismissed by FTC v. Noland*, 2021 WL

6426079 (9th Cir. Dec. 14, 2021).[140]

---

[139] Relief under Section 19(b) is available for rules "respecting unfair or deceptive acts or practices" under the FTC Act. 15 U.S.C. §§ 57b(a)(1). The Telemarketing Sales Rule is such a rule. 15 U.S.C. § 6102(c)(1).

[140] In *FTC v. AMG Capital Mgmt., LLC*, 593 U.S. 67 (2021), the Supreme Court reaffirmed courts' authority to enjoin violations under Section 13(b) but instructed that that section allows only for prospective injunctive relief, not recovery of equitable monetary relief. Before the *AMG* decision, the FTC often relied on Section 13(b) to seek monetary relief and related injunctive relief such as asset freezes and receiverships. For example, in the case that ultimately led to the *Simple Health Plans* Eleventh Circuit decision, which also involved allegations of deceptive marketing of limited benefit plans and medical discount memberships, a court in this District entered an *ex parte* TRO under the authority of Section 13(b). *See* Order Granting *Ex Parte* TRO, *FTC v. Simple Health Plans, LLC*, No. 0:18-cv-62593-DPG (S.D. Fla. Oct. 31, 2018) (ECF No. 15). Subsequently, post-*AMG*, the Eleventh Circuit affirmed the asset freeze and receivership under the authority of Section 19 (*see* citation in text). For other examples of courts in this District entering *ex parte* TROs under Section 19, *see e.g., FTC v. Click Profit, LLC*, No. 1:25-cv-20973-JB (S.D. Fla. Mar. 5, 2025) (ECF No. 15) (entering *ex parte* TRO granting asset freeze, appointment of temporary receiver, immediate access, expedited discovery, and other equitable relief pursuant to Section 19); *FTC v. Ecom Genie Consulting LLC*, No. 1:24-cv-23976-RKA (S.D. Fla. Oct. 22, 2024) (ECF No. 15) (same); *FTC v. RivX Automation Corp.*, No. 1:24-cv-23152-JB (S.D. Fla. Aug. 21, 2024) (ECF No. 12) (same).

32

Courts in this District have issued *ex parte* relief of the type requested here in many other FTC cases.[141]

**B.      The FTC Meets the Standard for Preliminary Injunctive Relief.**

In determining whether to grant a TRO or preliminary injunction under Section 13(b) of the FTC Act, a court must determine if "(1) [the FTC] is likely to succeed on the merits, and (2) injunctive relief is in the public interest." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991). Unlike private litigants, the FTC need not prove irreparable injury. *IAB Mktg.*, 746 F.3d at 1232; *Univ. Health*, 938 F.2d at 1218; *FTC v. U.S. Mortg. Funding, Inc.*, No. 11-CV-80155, 2011 WL 810790, at *2 (S.D. Fla. Mar. 1, 2011) ("The burden imposed on the FTC is lighter than the burden imposed on private litigants by the traditional equity standard . . .").

Here, the FTC amply demonstrates that it will ultimately succeed on the merits of its claims, and the balance of equities favors injunctive relief.

**1.      The FTC Is Likely to Succeed on the Merits.**

To establish likelihood of success, the FTC need only present evidence that it "likely will prevail," rather than evidence that would justify a "final determination"; a "preliminary

---

[141] For *ex parte* TROs issued under the authority of Section 19 after the AMG decision, *see* footnote 140, *supra*. For *ex parte* TROs entered pre-*AMG*, *see, e.g., FTC v. Digital Income Sys., Inc.*, No. 1:20-cv-24721-UU (S.D. Fla. Nov. 17, 2020) (ECF No. 12); *FTC v. On Point Global LLC*, No. 1:19-cv-25046-RNS (S.D. Fla. Dec. 13, 2019) (ECF No. 17); *FTC v. Pointbreak Media, LLC*, No. 0:18-cv-61017-CMA (S.D. Fla. May 8, 2018) (ECF No. 12); *FTC v. Student Debt Doctor LLC*, No. 0:17-cv-61937-WPD (S.D. Fla. Oct. 3, 2017) (ECF No. 9); *FTC v. Am. Student Loan Consolidators, LLC*, No. 0:17-cv-61862-DPG (S.D. Fla. Sept. 26, 2017) (ECF No. 9); *FTC v. Strategic Student Sols. LLC*, No. 9:17-cv-80619-WPD (S.D. Fla. May 15, 2017) (ECF No. 10); *FTC v. Marcus*, No. 0:17-cv-60907-CMA (S.D. Fla May 9, 2017) (ECF No. 13); *FTC v. World Patent Mktg., Inc.*, No. 1:17-cv-20848-DPG (S.D. Fla. Mar. 8, 2017) (ECF No. 11).

assessment" of ultimate success is enough. *Univ. Health*, 938 F.2d at 1218 (internal quotations and citations omitted). The FTC satisfies this standard by establishing "some chance of probable success on the merits." *FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 347 (9th Cir. 1989) (internal quotations and citations omitted).

The FTC has met this standard. The FTC submits ample proof showing it is likely to succeed on the merits.[142] The evidence shows that Defendants are violating Section 5 of the FTC Act and the TSR by flagrantly misrepresenting the health care products they sell to consumers. The evidence also shows that Tiffanie Gonzalez, Ramzey Hassoun, and Richard Sargent are liable as individuals for these violations because they have authority to control this common enterprise and notice of and involvement in the deceptive practices.

### a. Defendants are Violating the FTC Act.

The FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See On Point Cap. Partners*, 17 F.4th at 1079; *FTC v. People Credit First,* LLC, 244 F. App'x 942, 944 (11th Cir. 2007) (per curiam) (following *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *FTC v. Simple Health Plans, LLC*, 379 F. Supp. 3d 1346, 1360 (S.D. Fla. 2019) *aff'd*, 801 Fed. App'x 685 (11th Cir. 2020) (quoting *FTC v.*

---

[142] At this stage, the court may consider hearsay and other evidence that may be inadmissible at the permanent injunction stage. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, F.3d 982, 985 (11th Cir. 1995) ("[A] district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'") (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

34

*Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007)). In determining whether a representation is likely to mislead consumers, "courts consider the 'overall net impression rather than the literal truth or falsity' of the representation. *Id.* (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008)); *see also FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *Id.* (quoting *FTC v. Cyberspace.com LLC*, 453 F.2d 1196, 1200 (9th Cir. 2006)); *see also Simple Health Plans*, 379 F. Supp. 3d at 1362 (citing and quoting *Cyberspace.com*).

Here, in conducting their bait-and-switch scheme, Defendants make at least four false claims to induce consumers to purchase their non-health insurance products. Defendants promise that they are selling the consumer: (1) comprehensive health insurance, and specifically (2) PPO plans (3) that provide substantial coverage for specific medical needs and (4) cap consumers' liability. As described above, each of these claims is false, misleading, or unsubstantiated.[143]

At times, Defendants make these claims expressly; in other instances they deliberately imply them. Further, these claims go to the heart of the products promised by Defendants. Accordingly, the claims are material. *Simple Health Plans*, 379 F. Supp. 3d at 1360 (S.D. Fla. 2019) (express or deliberately implied claims presumed to be material, and implied claims that go to the "central characteristic of the product or service offered" are material).

Here, Defendants mischaracterized their plans as comprehensive health insurance, and specifically as PPO plans, when they were neither.[144] Defendants also promised that their plans would provide consumers substantial coverage for their various medical needs and represented

---

[143] *See supra* at pp. 7-16.
[144] *See supra* at pp. 7-13.

consumers could expect caps on their out-of-pocket medical costs.[145] These were also blatant lies—Defendants in fact enrolled consumers in products that provided limited, fixed coverage and left consumers exposed to the risk of unlimited medical expenses.[146]

Indeed, these representations not only are likely to, but in fact do, affect consumers' conduct, as shown by the consumer testimony supporting this motion. Consumers report that Defendants' misrepresentations led them to believe they were purchasing comprehensive health insurance from Defendants.[147] Consumers also report that had they known these products were limited benefit plans and medical discount memberships, and not comprehensive health insurance, they would not have purchased Defendants' products.[148]

### b. Defendants are violating the TSR.

The FTC is likely to show that Defendants' actions violate the TSR, which prohibits "sellers" and "telemarketers" from misrepresenting what they are selling. Defendants are "sellers" and "telemarketers" and their sales practices are therefore covered by the TSR because, in connection with a telemarketing transaction,[149] they arrange for the sale of goods or services.

---

[145] *See supra* at pp. 13-16.

[146] *See supra* at pp. 19-20.

[147] Schreck Dec. at ¶5 (App. 391-392); ("Because I thought the plan that [Defendants' agents] were presenting to me was comprehensive major-medical insurance coverage, I decided to go ahead and enroll."); Lagerberg Dec. at ¶6 (App. 157); Lutz Dec. at ¶4 (App. 329); Musselman Dec. at ¶8 (App. 380); Singh Dec. at ¶8 (App. 404); R. Sweeney Dec. at ¶4 (App. 543); N. Sweeney Dec. at ¶3 (App. 553).

[148] Stephan Dec. at ¶10 (App. 501); Schreck Dec. at ¶12 (App. 393-394); Lagerberg Dec. at ¶ 13 (App. 160); Lutz Dec. at ¶11 (App. 331); Horn Dec. at ¶14 (App. 87); Musselman Dec. at ¶16 (App. 383); Lee Dec. at ¶10 (App. 299); Huff Dec. at ¶9 (App. 152); Singh Dec. at ¶11 (App. 405); R. Sweeney Dec. at ¶9 (App. 545); N. Sweeney Dec. at ¶10 (App. 555).

[149] The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . .by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2 (ii). As shown by consumer declarations, Defendants or their lead generators contact consumers in several states by telephone to induce the purchase of the products they offer. *See* Lagerberg Dec. at ¶1 (App. 156)

36

16 CFR § 310.2 (ee); (hh). The TSR prohibits affirmative misrepresentations about goods or services as well as failure to disclose certain information. Violations of the TSR are also violations of the FTC Act; under Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 16 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### (1)   Misrepresentations in violation of the TSR.

The TSR prohibits "sellers" and "telemarketers" from:

2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

.... (iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer[.]

16 CFR § 310.3(a)(2)(iii).

Additionally, the TSR prohibits "sellers" and telemarketers" from "[m]aking a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution." 16 CFR § 310.3(a)(4). Defendants' misrepresentations that violate Section 5 of the FTC Act, as demonstrated above,[150] also violate these provisions of the TSR.

### (2)   Failure to disclose material information in violation of the TSR.

The TSR also prohibits sellers or telemarketers from:

---

(consumer lives in California); Stephan Dec. at ¶1 (App. 499) (Michigan); Huff Dec. at ¶1 (App. 150) (Kentucky); Giugliano Dec. at ¶1 (App. 54) (New York); Schreck Dec. at ¶1 (App. 391) (Connecticut); Horn Dec. at ¶1 (App. 83) (Illinois); Lee Dec. at ¶1 (App. 296) (Minnesota); Singh Dec. at ¶1 (App. 403) (New Jersey); Lutz Dec. at ¶1 (App. 328) (Pennsylvania); Musselman Dec. at ¶1 (App. 378) (Michigan); N. Sweeney Dec. at ¶1 (App. 553) and R. Sweeney Dec. at ¶1 (App. 543) (Illinois).

[150] *See supra* at pp. 34-36.

1) Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

. . . . (ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer [.]

16 CFR § 310.3(a)(1)(ii).

Defendants have failed to disclose to consumers, prior to their consent to purchase, that the products they were purchasing: (1) were not comprehensive health insurance or its equivalent; (2) contained severely restrictive limits on monetary benefits provided for medical services, including, but not limited to, per day, per incident, per annual, and lifetime limits on monetary benefits; and (3) did not have out-of-pocket maximums for many of the costliest medical services due to monetary limits on plan benefits.[151]

### c. Corporate Defendants operate as a Common Enterprise.

Corporate Defendants operate as a common enterprise to ensure collective success.[152] Therefore they can be held liable for one another's acts. *See FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017) (corporate entities "can be held liable for the conduct of other entities where the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities.") (internal quotation marks omitted); *see also WV Universal Mgmt.*, 877 F.3d at 1240. In determining a common enterprise, courts consider factors such as common control, sharing of offices and officers, and whether there is a "real distinction" between the entities. *See FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246, 1257 (M.D. Fla. 2018), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9,

---

[151] *See supra* at pp. 7-16.
[152] *See generally supra* at pp. 29-31.

38

2022) (internal quotation omitted); *see also FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940, at *7 (S.D. Fla. Jan. 31, 1996).

As demonstrated above, Corporate Defendants here are an interrelated network of companies, with common ownership, officers, managers, business functions, employees and sales agents, office locations, and commingled assets.[153] Because these Corporate Defendants have operated as a common enterprise, each may be held jointly and severally liable for the deceptive acts and practices of another corporation where the corporations act as a common enterprise.

### d. Tiffanie Gonzalez, Ramzey Hassoun, and Richard Sargent are Individually Liable for Injunctive and Monetary Relief.

An individual may be held liable for injunctive relief under the FTC Act if the individual had "some knowledge of the practices" and either "participated directly in the practice or acts or had the authority to control them." *On Point Cap. Partners*, 17 F. 4th at 1083 (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)); *see also IAB Mktg.*, 746 F.3d at 1233. Intent to deceive is not necessary and the FTC must show only that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud along with intentional avoidance of the truth." *FTC v. Partners In Health Care Assoc., Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016) (quoting *FTC v. 1st Guar. Mortg.*, No. 09-cv-61840, 2011 WL 1233207, at *15 (S.D. Fla. March 30, 2011). "An individual's degree of participation in the business is probative of knowledge." *Id.*; *see also FTC v. Consumer Collection Corp.*, No. 14-cv-62491, 2015 WL 12533013, at *6 (S.D. Fla. Sept. 9, 2015) (dissemination of scripts containing misrepresentations

---

[153] *See generally supra* at pp. 21-31.

by sole officer and manager of corporate accounts showed requisite knowledge), *aff'd,* 668 F. App'x 357 (11th Cir. 2016).

As to the "control" component, "'[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.'" *Partners In Health Care Assoc.,* 189 F. Supp. 3d at 1367 (quoting *Transnet Wireless,* 506 F. Supp. 2d at 1270). Control can also be shown by an individual's signatory authority on corporate bank accounts. *See, e.g. Life Mgmt. Servs. of Orange Cnty.,* 350 F. Supp. 3d at 1261 (M.D. Fla. 2018) (court lists defendant's sole signatory authority on corporate bank account as a factor showing control), *aff'd,* No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022).

The standard for individual liability under the TSR for the acts of the corporate entity is the same as under the FTC Act—knowledge and either participation or ability to control. *See Partners In Health Care Assoc.,* 189 F. Supp. 3d at 1368 (finding individual defendant liable under the TSR on the same facts that supported liability under the FTC Act); *see also FTC v. Noland,* No. CV-20-00047-PHX-DWL, 2021 WL 4127292, at *29 n. 17 (D. Ariz. Sept. 9, 2021) (noting that the same test for individual liability applies to FTC rules such as the Merchandise Rule and the Cooling-Off Rule "because violations of those rules are themselves unfair or deceptive acts or practices under §5(a) by operation of 15 U.S.C. § 57a(d)(3)"). This standard applies whether the FTC is seeking injunctive relief through Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), or monetary relief through Section 19 of the FTC Act, 15 U.S.C. § 57b, for violations of the TSR. *See FTC v. Elegant Sols., Inc.,* 2022 WL 2072735, at *2 (9th Cir. 2022) (district court properly held individual defendants liable for injunctive relief under Section 13 and monetary relief for violations of the TSR under Section 19, because of the individuals' authority to control the corporate entities and knowledge of the violations); *Noland,* 2021 WL

40

4127292, at *29 (granting summary judgment against individual defendants for both injunctive relief and monetary relief for violations of the Merchandise Rule and Cooling-Off Rule).

The FTC is likely to succeed in showing that Individual Defendants are each liable as individuals for injunctive relief based on their direct participation in and authority to control the scheme. Gonzalez founded THO and together with Hassoun, secured the enterprise's initial contracts with lead generators and vendors, developed sales scripts, and hired employees.[154] Hassoun is also responsible for founding the enterprise, trains its sales agents, and handles "Data Management" of lead generation for the enterprise.[155] Sargent has acted as THO's "Director of Operations" and as Gonzalez's other business partner, maintains relationships with the enterprise's lead generators and vendors, created consumer-facing websites for several Corporate Defendants, and has been the subject of consumer complaints alleging deceptive telemarketing practices.[156] Individual Defendants are business partners who make decisions together in support of the enterprise.[157] Each Individual Defendant owns one or more of the Corporate Defendants, manages or directs their activities or finances, and reports to Defendants' offices to manage operations in person.[158]

The FTC is also likely to succeed in showing that Individual Defendants are individually liable for monetary relief based on their knowledge of the wrongdoing. In addition to having control over the daily operations of Corporate Defendants, they serve as the points of contact for the financial institutions, offices, vendors, and web domain providers used to perpetrate their

---

[154] *See supra* at pp. 21-23.
[155] *See supra* at pp. 22-23.
[156] *See supra* at p. 23; *see also* footnote 100, *supra*.
[157] *See* footnote 82 and accompanying text, *supra*.
[158] *See supra* at pp. 23-25; *see also* footnote 108 and accompanying text, *supra* and footnote 126 and accompanying text, *supra*.

41

scheme.[159] Moreover, they direct among Corporate Defendants and one another, a constant flow of corporate funds, which they proceed to spend on extravagant personal expenses.[160]

The representations Defendants made to consumers were clearly false or unsubstantiated. Individual Defendants knew their sales agents were not providing the promised services: they trained or managed their staff, developed sales scripts, secured the initial contracts with the administrators of the non-health insurance products Defendants sell, and directed or managed the downline companies that continue to expand Defendants' deceptive practices.[161] Individual Defendants were also made aware of consumer complaints against Defendants alleging, for example, that they were misrepresenting their products as "actual insurance" when they are not.[162] Thus, the FTC is likely to succeed in showing that Gonzalez, Hassoun, and Sargent were at least recklessly indifferent to the truth or falsity of such representations.

### 2.     The Equities Weigh in Favor of Granting Injunctive Relief.

The public interest in halting Defendants' unlawful conduct outweighs any interest Defendants may have in continuing to unlawfully market their services. "The public interest in ensuring the enforcement of federal consumer protection laws is strong." *Simple Health Plans*, 379 F. Supp. 3d at 1363 (quoting *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011)). When a court weighs the public interest against a private interest, the public interest should receive the greater weight. *Id.* (citing *World Wide Factors.*, 882 F.2d at 347; *FTC v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800 at *1 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, No. 0:18-CV060379-KMM, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018); *FTC v. USA*

---

[159] *See supra* at pp. 23-24.
[160] *See supra* at pp. 30-31.
[161] *See* footnotes 85 and 86 and accompanying text, *supra*; *see also* pp. 23-24, *supra*.
[162] *See* footnote 100 and accompanying text, *supra*.

42

*Beverages, Inc.*, No. 05-61682-CIV, 2005 WL 5654219 at *8 (S.D. Fla. Dec. 6, 2005), *report and recommendation adopted*, No. 05-6182, 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005).

Private equities should be given "little weight;" otherwise the FTC Act's purpose of protecting the public as a whole would be undermined. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (injunction to enjoin acquisition pursuant to Section 13(b) of the FTC Act was in the public interest). Where the FTC has shown a likelihood of success on the merits, the court may presume that the public interest will be served by interim relief. *FTC v. Digit. Income Sys., Inc.*, No 20-24721-CV-UNGARO, 2020 WL 7481548, at *2 (S.D. Fla. Dec. 1, 2020), *report and recommendation adopted*, No. 1:20-CV-24721, 2020 WL 7480820 (S.D. Fla. Dec. 18, 2020).

The evidence demonstrates that the public equities—protection of consumers from Defendants' unlawful telemarketing scheme, effective enforcement of the law, and the preservation of assets—weigh in favor of granting the requested injunctive relief. In contrast, "there is no oppressive hardship to Defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment." *Simple Health Plans*, 379 F. Supp. 3d at 1363-64 (quoting *World Wide Factors.*, 882 F.2d at 347).

### C.    The Scope of the Proposed *Ex Parte* TRO is Necessary and Appropriate.

The FTC requests that the Court grant a TRO that includes conduct relief, asset preservation, a temporary receiver, and immediate access to business locations. Courts in this district and throughout the Eleventh Circuit have routinely granted this relief in similar cases. *See supra* pp. 32-33. The evidence shows that the FTC is likely to succeed in proving that Defendants are engaging in deceptive and unfair practices in violation of the FTC Act and the

43

TSR, and that the balance of the equities strongly favors the public. Preliminary injunctive relief, including a temporary restraining order, is thus justified.

### 1.    Conduct Relief

To prevent ongoing consumer injury, the FTC requests that the Court issue a TRO that prohibits further law violations of Section 5(a) of the FTC Act and the TSR. These measures simply require Defendants to comply with the law and are squarely within the Court's injunctive authority under Section 13(b) of the FTC Act.

### 2.    Asset Preservation Is Necessary to Preserve the Possibility of Final Relief.

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits of a Section 19 claim and the refund of money would be an appropriate final remedy. An asset freeze is proper because it "may be needed to make permanent relief possible." *Gem Merch.*, 87 F.3d at 469; *see also Simple Health Plans*, 58 F.4th at 1329-30 ("[I]f preliminary measures like an asset freeze or a receivership are necessary to preserve funds for a future monetary judgment, they are authorized by § 19(b)."). "[T]he FTC does not need to present evidence that the assets will be dissipated; rather, it need only show a concern that the Defendants' assets will disappear." *Simple Health Plans*, 379 F. Supp. 3d at 1364 (citations omitted); *FTC v. World Patent Mktg.*, No.17-cv-20848-GAYLES, 2017 WL 3508639, at *17 (S.D. Fla. Aug. 16, 2017).

Here, an asset freeze is necessary to preserve the status quo, ensure that funds do not disappear during this action, and preserve Defendants' assets for final relief. Defendants' unlawful scheme is wholly premised on collecting payment information from consumers who they falsely convince are purchasing comprehensive health insurance. Defendants earn generous commissions on these sales, which they then dissipate by funding lavish lifestyles.

44

Without an asset freeze, the dissipation of assets is likely. Some Corporate Defendants take in hundreds of thousands of dollars in monthly income, while THO alone regularly takes in more than $1 million many months.[163] It is evident that Defendants earn to spend.[164] They funnel these millions not only back into running their enterprise, but also to enjoy excessive personal lives. Individual Defendants transfer corporate funds to poker players and spend tens of thousands of dollars each night out at clubs and live sporting events.[165] They regularly charge hundreds of thousands of dollars to business credit cards associated with Corporate Defendants' accounts, on shopping sprees to Louis Vuitton, charter yachts, weekend Vegas trips, and international European vacations.[166] Frequently, Defendants charge more than $500,000 monthly business and personal expenses to their corporate cards, which they immediately pay off using their scheme's earnings.[167] Defendants' habit of squandering their corporate funds necessitates an asset freeze to prevent likely dissipation upon notice of this action.

Evidence also suggests that Individual Defendants and their business associates have a history of forming new entities to perpetuate their scheme under a new business name. In addition to operating Corporate Defendants, over the years, Individual Defendants have opened and closed at least two dozen other entities in their names.[168] These entities represent potential vehicles Individual Defendants could use to hide and dissipate assets.

---

[163] McPeek Dec. at ¶56 (App. 696).
[164] *Id.* at ¶57 (App. 696-697).
[165] *Id.* at ¶¶64, 82, 84 (App. 701, 706-707).
[166] *Id.* at ¶¶61-64 (App. 699-701).
[167] *Id.* at ¶57 (App. 696-697).
[168] *Id.* at ¶28 (App. 690-691).

Freezing individual assets is also warranted when, as here, Individual Defendants directly control the businesses that perpetrate the unfair and deceptive acts alleged, reflecting a high risk of dissipation of assets.

### 3.    A Receiver Is Necessary to Halt the Injury and Locate and Preserve Business Assets and Records.

The FTC seeks appointment of a temporary receiver over Corporate Defendants. This Court has the authority to appoint a receiver when, as here, the FTC has established that it is likely to succeed on a Section 19 claim for monetary relief, and the receiver is necessary to preserve funds for a future monetary judgment. *Simple Health Plans LLC*, 58 F.4th at 1330. "When a defendant has used deception to obtain money from consumers, 'it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of [victims].'" *Simple Health Plans*, 379 F. Supp. 3d at 1365 (quoting *SEC v. First Fin. Grp. Of Texas.*, 645 F.2d 429, 438 (5th Cir. 1981)); *World Patent Mktg.*, 2017 WL 3508639, at *17.  A receiver can also prevent further fraudulent practices and resulting harm during litigation. *Simple Health Plans*, 379 F. Supp. 3d at 1365; *Noland*, 2021 WL 4318466, at *4 (receivership can still be appropriate under Section 13(b) where "the purpose of the receivership is to prevent the same sort of ongoing harm that the ultimate object of the § 13(b) litigation—the issuance of a permanent injunctions—is intended to achieve.").

If Defendants remain in control of their enterprise, they are likely to destroy evidence and dissipate the fruits of their fraud. In June 2024, a state insurance regulator, Special Investigator Glenn Chapter, stumbled upon one of Defendants' call centers, observing about 50 sales agents and ample call center equipment at the premises. An individual at the premises escorted Special Investigator Chapter off of the premises and refused to answer his questions, despite the

46

investigator's statutory authority to inspect insurance agencies.[169] When the investigator returned to the same location only a few weeks later, he observed far less equipment and fewer sales agents working the call center.[170] To prevent the potential destruction of evidence and preserve assets, Defendants should not be trusted to continue control of their operation.

A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity. A receiver would also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court.

### 4.      Immediate Access and Limited Expedited Relief Are Appropriate.

Section XXI of the proposed TRO directs Defendants to provide both the temporary receiver and the FTC with immediate access to Defendants' business premises. This will enable the receiver and the FTC to locate assets quickly and efficiently that Defendants have wrongfully taken from consumers, identify possible additional defendants, and locate and secure documents pertaining to Defendants' business.

The FTC also seeks permission to conduct limited expedited discovery to locate and identify documents and assets. *See* Section XXIII of the proposed TRO. District courts may depart from normal discovery procedures to meet discovery needs in particular cases. *See* FED. R. CIV. P. 26(d)(1), 30(a)(2), 33(a), & 34(b). In particular, the risk of dissipation of assets can support "good cause" for expedited discovery. *See SEC v. MCC International Corp.*, No. 2:22-cv-14129-KMM, 2022 WL 2341216, at *6 (S.D. Fla. Apr. 26, 2022) (good cause existed for expedited discovery before preliminary injunction hearing because defendants resided overseas

---

[169] Chapter Dec. at ¶¶3-5 (App. 617-618).
[170] *Id.* at ¶¶6-7 (App. 618-619).

47

and at least one defendant had recently been winding down his U.S. assets); *see also Start Connecting LLC*, at \*2 (permitting the FTC and appointed receiver to take expedited discovery).

### 5. The TRO Should Be Issued Without Notice to Defendants to Preserve the Court's Ability to Fashion Meaningful Relief.

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies non-noticed relief. Federal Rule of Civil Procedure 65(b) permits this Court to grant a TRO without notice if it appears notice will result in "immediate and irreparable injury, loss, or damage" and the applicant certifies the reason why. FED. R. CIV. P. 65(b)(1)(A); *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). Issuing the *ex parte* TRO without notice in this case is indispensable to preserving the status quo, including securing assets needed to provide full and effective relief pending a hearing on the preliminary injunction.

As discussed above, Defendants' business operations are permeated by unlawful practices. The FTC's experience shows that defendants engaged in fraudulent schemes similar to Defendants' often withdraw funds from bank accounts and move or shred documents upon learning of impending legal action. *See* Rule 65 Decl. at pp. 5-11; *see also AT&T Broadband*, 381 F.3d at 1319 (summarizing evidence that similar defendants in previous cases "secreted evidence" once given notice). Defendants' conduct—including moving large sums from corporate accounts to pay corporate credit card bills—and the nature of Defendants' illegal scheme makes it is highly likely that Defendants would conceal or dissipate assets absent non-noticed relief. Courts therefore have regularly granted the FTC *ex parte* relief in similar cases.

## IV.   CONCLUSION

The FTC asks the Court to halt the unlawful practices of a scheme that has defrauded consumers of millions of dollars. Defendants prey on vulnerable consumers searching for

48

comprehensive health insurance coverage and use their ill-gotten funds to pay for luxurious lifestyles. The FTC already has marshaled evidence demonstrating that it will likely succeed on the merits at trial. Immediate relief is necessary to prevent continued harm to the public and preserve assets to ensure effective relief. For the forgoing reasons, Plaintiff requests that the Court enter the proposed TRO.

Dated: _January 12, 2026_

Respectfully submitted,

Tammy Chung (Special Bar No. A5503438)
Jason C. Moon (Special Bar No. A5502384)
Nicole G. H. Conte (Special Bar No. A5503436)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9399; tchung@ftc.gov (Chung)
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9396; nconte@ftc.gov (Conte)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

49